# EXHIBIT 1

## Swenson, Jon

| | |
|---|---|
| **From:** | Swenson, Jon |
| **Sent:** | Sunday, December 16, 2018 3:54 PM |
| **To:** | 'Herrington, Beth'; 'Fieweger, James P (35849)' |
| **Cc:** | Guy, Hop; 'Gollwitzer, Arthur III (73161)'; 'Bertin, Robert C.' |
| **Subject:** | RE: Call |
| **Attachments:** | Motion to Extend Deadline to Produce ESI_Active_39165112_5.DOCX |

All,

Please find attached Defendants' proposed motion to modify the MIDP disclosures.  Please let us know prior to or on the meet and confer tomorrow if Plaintiff opposes the motion.

Thanks,

Jon

---

**From:** Swenson, Jon
**Sent:** Friday, December 14, 2018 7:07 PM
**To:** Herrington, Beth; Fieweger, James P (35849)
**Cc:** Guy, Hop; Gollwitzer, Arthur III (73161); Bertin, Robert C.
**Subject:** RE: Call

Beth,

Let's plan for a call at 10:30 am central on Monday.  We can use the following dial-in:

1-888-822-7517;
Passcode: 2548367

Attached are our initial revisions to the protective order you proposed.  I've included a clean copy and redline.

Also, we will be sending you a draft motion to modify the scope and timing of the production of materials under the MIDP prior to the call.  If you have any comments on these or proposals regarding the issues you raise below, please provide them in writing prior to the call.

Thanks,

Jon

---

**From:** Herrington, Beth <beth.herrington@morganlewis.com>
**Sent:** Friday, December 14, 2018 1:53 PM
**To:** Fieweger, James P (35849) <jpfieweger@michaelbest.com>
**Cc:** Guy, Hop <hop.guy@BakerBotts.com>; Swenson, Jon <jon.swenson@bakerbotts.com>; Gollwitzer, Arthur III (73161) <agollwitzer@michaelbest.com>; Bertin, Robert C. <robert.bertin@morganlewis.com>
**Subject:** RE: Call

I had proposed 10:30 am on Monday as an option.  Does that time not work?  I'm traveling to a dep in the afternoon.

Thanks—
Beth


Beth Herrington
Morgan, Lewis & Bockius LLP
77 West Wacker Drive | Chicago, IL 60601
Direct: +1.312.324.1445 | Main: +1.312.324.1000 | Cell: +1.312.543.8291 | Fax: +1.312.324.1001
beth.herrington@morganlewis.com | www.morganlewis.com
Assistant: Rhoda Morris | +1.312.324.1157 | rhoda.morris@morganlewis.com

---

**From:** Fieweger, James P (35849) <jpfieweger@michaelbest.com>
**Date:** Friday, Dec 14, 2018, 2:08 PM
**To:** Herrington, Beth <beth.herrington@morganlewis.com>
**Cc:** hop.guy@BakerBotts.com <hop.guy@BakerBotts.com>, jon.swenson@bakerbotts.com <jon.swenson@bakerbotts.com>, Gollwitzer, Arthur III (73161) <agollwitzer@michaelbest.com>, Bertin, Robert C. <robert.bertin@morganlewis.com>
**Subject:** RE: Call

[EXTERNAL EMAIL]
Beth
Any reason we can't do the call Monday?  I can't imagine it will take more than 10-15 minutes.

# James P. Fieweger
**Partner**
**T**  312.596.5849  |  michaelbest.com



---

**From:** Herrington, Beth <beth.herrington@morganlewis.com>
**Sent:** Friday, December 14, 2018 7:25 AM
**To:** Fieweger, James P (35849) <jpfieweger@michaelbest.com>
**Cc:** hop.guy@BakerBotts.com; jon.swenson@bakerbotts.com; Gollwitzer, Arthur III (73161) <agollwitzer@michaelbest.com>; Bertin, Robert C. <robert.bertin@morganlewis.com>
**Subject:** RE: Call

Hi Jim – Could we instead talk at either 10:30 a.m. CT on Monday or 1 p.m. CT on Tuesday?

In addition to the topics you raised, we'd also like to discuss:

    (i)       The sufficiency of defendants' disclosures
    (ii)      The protective order
    (iii)     ESI

Please let me know if either time works.

Thanks—
Beth


**Beth Herrington**
**Morgan, Lewis & Bockius LLP**
77 West Wacker Drive | Chicago, IL 60601

Direct: +1.312.324.1445 | Main: +1.312.324.1000 | Cell: +1.312.543.8291 | Fax: +1.312.324.1001
beth.herrington@morganlewis.com | www.morganlewis.com
Assistant: Rhoda Morris | +1.312.324.1157 | rhoda.morris@morganlewis.com

---

**From:** Fieweger, James P (35849) <jpfieweger@michaelbest.com>
**Sent:** Wednesday, December 12, 2018 1:34 PM
**To:** Herrington, Beth <beth.herrington@morganlewis.com>
**Cc:** hop.guy@BakerBotts.com; jon.swenson@bakerbotts.com; Gollwitzer, Arthur III (73161) <agollwitzer@michaelbest.com>
**Subject:** Call

[EXTERNAL EMAIL]

Beth
Let me know if there is a time Friday after 11:00 CST that we can talk to address (1) the sufficiency of Ubiquiti's initial disclosures and (2) applying the amended MIDPP order to our case.

## James P. Fieweger
**Partner**
**E** jpfieweger@michaelbest.com
**T** 312.596.5849 | **M** 312.259.4913 | **F** 312.222.0818


Michael Best & Friedrich LLP    **A** Lex**Mundi** Member

my bio | our firm | vCard

Email Disclaimer
*******************************************************************
The information contained in this communication may be confidential, is intended only for the use of the recipient(s) named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please return it to the sender immediately and delete the original message and any copy of it from your computer system. If you have any questions concerning this message, please contact the sender.

DISCLAIMER
This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and as such privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UBIQUITI NETWORKS, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> CAMBIUM NETWORKS, INC.; <br> CAMBIUM NETWORKS, LTD.; <br> BLIP NETWORKS, LLC; <br> WINNCOM TECHNOLOGIES, INC.; <br> SAKID AHMED; and DMITRY <br> MOISEEV, <br><br> *Defendants*. | Civil Action No.: 1:18-cv-05369 <br><br> **JURY TRIAL DEMANDED** |

**DEFENDANTS' [UN]OPPOSED MOTION TO EXTEND THE DEADLINE TO
PRODUCE ESI PURSUANT TO THE MIDP STANDING ORDER**

## I.     INTRODUCTION

Defendants Cambium Networks, Inc. ("Cambium"), Cambium Networks, Ltd. (collectively, "Cambium Defendants"), Blip Networks, LLC, Winncom Technologies, Inc., Sakid Ahmed, and Dmitry Moiseev (all six defendants collectively, "Defendants") respectfully request that the Court grant an extension to the deadline for production of Electronically Stored Information ("ESI") set by the Mandatory Initial Discovery Pilot Project Standing Order ("MIDP Standing Order"). Defendants' Motion to Dismiss Under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1) ("Motion to Dismiss") as to all 14 claims for relief asserted against Cambium and the single claim for relief against the other Defendants is currently pending. Motion to Dismiss (D.I. 37), October 19, 2018. At the December 11, 2018 status conference (the "Status Conference"), in response to Defendants' Motion to Dismiss, Plaintiff Ubiquiti Networks, Inc. ("Plaintiff") argued that as to the central Claims 4 and 6 pertaining to copyright infringement and breach of contract by Cambium, the case is limited to two main "buckets," or factual scenarios.  The first bucket relates to the claim that Cambium violated the public performance right in Plaintiff's User Interface, and the second bucket pertains to certain unspecified code containing the configuration and calibration information and the AirMAX protocol ("Plaintiff's Admissions").  The RICO Claim 15 is the only claim asserted against the remaining Defendants (Defendants Cambium Networks, Ltd., Winncom, Blip, Ahmed, and Moiseev), and resolution of that claim in Defendants' favor would remove them from this case, leaving only Cambium.

Given this posture, it would be unduly burdensome for the 5 non-Cambium Defendants to undertake the burden of producing ESI related to 14 claims not asserted against them, while the Motion to Dismiss is pending. It would also be unduly burdensome for Cambium to have to undertake the burden of producing ESI for the 14 claims outside of the two "buckets" of

allegations that Plaintiff admitted were the only things at issue in this case. Finally, the newly revised Amended Standing Order Regarding Mandatory Initial Discovery Pilot Project, December 1, 2018 ("Amended MIDP Standing Order") automatically postpones the production of ESI until after an order on any Rule 12(b) motions in recognition of this undue burden. Defendants' request that the present case be brought within the provisions of the Amended MIDP Standing Order.

Under the pre-existing MIDP Standing Order procedures, Defendants and Plaintiff served their Mandatory Initial Discovery Pilot Project ("MIDP") responses on December 5, 2018, as ordered by the Court. Notification of Docket Entry (D.I. 36), October 18, 2018. Under the MIDP Standing Order's requirement that all parties produce the identified ESI within forty days after serving their initial responses, the current ESI production deadline is January 14, 2019.

For the reasons below, and as invited by the Court, Defendants respectfully request that the ESI production deadline set by the MIDP Standing Order be continued until 40 days after any amended pleading filed after the entry of an order resolving the pending Motion to Dismiss or 40 days after an order denying Defendants' Motion to Dismiss.

This is Defendants' first request for an extension of a discovery deadline. [Plaintiff opposes this motion.]

II.     ARGUMENT

A.     The MIDP disclosure requirements should be significantly narrowed based on Plaintiff's Admissions.

Plaintiff's Complaint asserts 14 causes of action against Cambium, the vast majority of which are based on Cambium's alleged copyright infringement of unidentified portions of Plaintiff's code. As the Court noted at the Status Conference, the current claims are concealed within a "scavenger hunt" of overbroad factual allegations. *See* December 11, 2018 Status

Conference Tr. (Exhibit 1) at 28:9. Despite containing 398 paragraphs of factual allegations over 74 pages, the Complaint relies on conclusory allegations and did not adequately put Defendants on notice as to what the actual claims of copyright infringement and breach are.

At the Status Conference, Plaintiff admitted that its copyright allegations are limited to Cambium's alleged display of its user interface (*see id.* at 17:16-20) and copying of unidentified configuration and calibration *information* and the AirMAX protocol (*see id.* at 17:23-18:7, 36:25-37:2). The Complaint does not reflect this limited scope of Plaintiff's Admissions, as the Court noted.[1] *See, e.g., id.* at 23:23-25, 24:17-18, 27:22. Nor did Plaintiff's Opposition briefing. *See* Ubiquiti Networks, Inc.'s Memorandum in Opposition to Defendants' Motion to Dismiss (D.I. 39).

There is an immense difference in the breadth of ESI production required pursuant to the MIDP Standing Order between the currently operative Complaint and a complaint properly narrowed to reflect Plaintiff's Admissions. As pointed out at the Status Conference, the definition of "Ubiquiti Firmware," which forms the basis for all of Plaintiff's claims, includes any object code provided with any Ubiquiti device. *See id.* at 33:15-21. Taken as a whole, the Complaint on its face purports to require Cambium to produce multiple versions of millions of lines of code and documents related to all aspects of its Elevate firmware. But what Plaintiff now admits is truly at issue requires only the production of a published "Quick Start Guide" and YouTube video created by Cambium Defendants and limited (but still-not-specified) portions of the Elevate firmware dealing with configuration and calibration information and the AirMax protocol. It's the difference between producing several images of the interface itself along with a small amount of code or information, versus producing multiple version of all of the code

---

[1]  The Court even noted a potential Rule 10 issue with Plaintiff's Complaint. Status Conference Tr. at 28:9-11 ("But at the same time, it can't be a scavenger hunt to kind of figure out what your claim is. That causes a Rule 10 problem.").

required to run the device. *See* Status Conference Tr. at 26:22-27:9. The latter now appears to be entirely unnecessary, particularly as a targeted preliminary disclosure.

Although Plaintiff is not required to set forth complete disclosure of its legal theories, it does have to factually state in a discernible way what it is that Cambium did to allegedly violate its copyrights. *Id.* at 29:24-30:3. Given Plaintiff's Admissions as to the true scope of the present lawsuit, any production required by automatic application of the old MIDP Standing Order procedures on Plaintiff's original Complaint creates an enormous hardship upon Defendants. Simple application of the new, Amended MIDP Standing Order procedures would entirely remove this hardship.

Defendants' Motion to Dismiss is still pending before the Court, and Defendants cannot ascertain the full scope of Plaintiff's allegations until the Court issues its ruling (even if it only limits the case to Plaintiff's Admissions and does not dismiss any of the other unsupported allegations against Defendants). Due to the uncertainty surrounding Plaintiff's allegations and Defendants' pending Motion to Dismiss, Defendants request that the ESI production deadline be continued until a reasonable time after the Court issues its order. After the ruling, the ultimate scope of Plaintiff's allegations and which claims for relief survive should be clear, and Defendants will be able to amend their MIDP responses and produce the required ESI without incurring as much unnecessary cost.

**B.      Continuing the ESI production deadline furthers the MIDP goals.**

The MIDP production should be limited to the allegations and claims in this case that will ultimately survive dismissal, or as limited by Plaintiff's Admissions. The Court recently amended the MIDP Standing Order, which in its amended version allows parties to serve their initial disclosures after a motion to dismiss is decided (*compare* MIDP Standing Order at § A.3. ("Parties must file answers, counterclaims, crossclaims, and replies within the time set forth in

Rule 12(a)(1)-(3) even if they have filed or intend to file a motion to dismiss or other preliminary motion") *with* Amended MIDP Standing Order at § A.3. ("Parties must file answers, counterclaims, crossclaims, and replies within the time set forth in Rule 12(a)")), because "the early-answer requirement of the MIDP *imposed unnecessary costs on parties who ultimately succeed on Rule 12 motions*." E-mail from U.S. Courts, "Important Amendment to the Mandatory Initial Discovery Pilot (MIDP) Effective Dec. 1, 2018" (November 28, 2018, 04:54 CST) (emphasis added). The current case is exactly the type of case that this amendment should benefit, since the scope of the case will narrow significantly in light of Plaintiff's Admissions. There is also a single claim asserted against the five non-Cambium Defendants that is subject to the Motion to Dismiss. If successful, it would completely eliminate these parties from the case.

Moreover, Plaintiff will not be prejudiced by an extension of the ESI production deadline. Plaintiff proposed that the deadline for completing fact discovery should be January 10, *2020.* Exhibit A to Rule 26(f) Report for Mandatory Initial Discovery Pilot (MIDP) (D.I. 32-1), October 12, 2018. Extending the ESI production deadline until after the Court weighs in on the appropriate scope of Plaintiff's claims would not meaningfully impact Plaintiff's proposed deadline. Additionally, Plaintiff may conduct discovery pursuant to the Federal Rules in the interim if it has concerns that certain ESI relevant to its claims will not be produced quickly enough. Thus, waiting until the Motion to Dismiss is ruled on will not be a burden on Plaintiff.

## III.     CONCLUSION

For the reasons set forth above, Defendants respectfully request that the default ESI production deadline set by the MIDP Standing Order be continued until 40 days after any amended pleading filed after the entry of an order resolving the pending Motion to Dismiss or 40 days after the order denying Defendants' Motion to Dismiss, and that any production be limited to Plaintiff's Admissions.

Dated:  December 17, 2018

Respectfully submitted,

BAKER BOTTS, LLP

*/s/ G. Hopkins Guy, III*
    One of their attorneys

G. Hopkins Guy III (CA Bar No. 124811)
hop.guy@bakerbotts.com
Jon V. Swenson (CA Bar No. 233054)
jon.swenson@bakerbotts.com
Karina Smith (CA Bar No. 286680)
karina.smith@bakerbotts.com
BAKER BOTTS L.L.P.
1001 Page Mill Road Building One, Suite 200
Palo Alto, CA 94304-1007
650.739.7500 (Phone)
650.739.7699 (Facsimile)

Andrew D. Wilson (DC Bar No. 1030144)
1299 Pennsylvania Ave. NW
Washington, DC 20004-2400
202.639.1312 (Phone)
202.508.9336 (Fax)
andrew.wilson@bakerbotts.com

Arthur J. Gollwitzer (06225038)
ajgollwitzer@michaelbest.com
James P. Fieweger (6206915)
jpfieweger@michaelbest.com
MICHAEL BEST & FRIEDRICH, LLP
444 West Lake Street, Suite 3200
Chicago, Illinois 60606
312.222.0800 (Phone)

*Attorneys for Defendants*
*Cambium Networks, Inc. et. al*

The undersigned, an attorney of record for the Defendants, hereby certifies that on December 17, 2018, a true and correct copy of the foregoing was served on counsel of record electronically via the Court's ECF system.

/s/ G. Hopkins Guy, III
G. Hopkins Guy, III

# EXHIBIT 2

**Swenson, Jon**

| | |
|---|---|
| **From:** | Herrington, Beth <beth.herrington@morganlewis.com> |
| **Sent:** | Monday, December 17, 2018 7:51 AM |
| **To:** | Fieweger, James P (35849) |
| **Cc:** | Guy, Hop; Swenson, Jon; Gollwitzer, Arthur III (73161); Bertin, Robert C. |
| **Subject:** | RE: Call |

Jim and Jon --

For today's call, we'd also like to discuss the following issues:

1. Mandatory disclosures of both parties – We propose both parties supplement by Thursday December 20. Set forth below are deficiencies in defendants' disclosures.

2. We propose ESI production be set at 40 days from December 20.

3. Defendants' motion to delay disclosures – We would oppose this motion as all defendants are alleged to have breached Ubiquiti's license agreements, hacked and made unauthorized use of the Ubiquiti firmware. Non-Cambium defendant's access to, copying, and unauthorized use of Ubiquiti firmware are at issue in the same way as Cambium defendants.

4. The protective Order (PO)– Defendants propose to set a date of January 8th for finalizing the PO.

5. ESI – we need to put a date on the calendar to discuss and finalize to ESI procedures. We propose finalizing the procedures by December 21.

With respect to Mandatory disclosures, each Defendant's disclosures are severely deficient. We expect that each defendant will fix these deficiencies by next Friday.

Deficiencies each Defendant needs to address in Mandatory Disclosures:

Rather than identify individuals, facts and events associated with each Defendant's access to and use of Ubiquiti firmware, role in the development, testing and promotion of Elevate and the reverse engineering and other violations of Ubiquiti's firmware license agreements, Defendants attempt to conceal people and events by not disclosing people or underlying facts and legal theories and making conclusory, false statements about the nature of Elevate. In most instances, Cambium identifies relevant documents as being in the possession of Ubiquiti and not defendants. This must be fixed in a supplemental response. Specific examples are provided below.

Blip Networks
1. Blip has not disclosed the identify of persons that downloaded or installed Ubiquiti firmware or participated in hacking with Elevate firmware on its network.
2. Blip has not stated any facts related to its testing or installation of Elevate, how it came into possession of Elevate before Elevate was released to the public or what legal basis it has for breaching the Ubiquiti license agreements, copying and making unauthorized use of Ubiquiti code and making unauthorized access to portions of the firmware that remain on Ubiquiti devices after hacking with Elevate.

Cambium parties – we need witnesses and facts from both Cambium defendants, not just one.

3. Cambium Networks has not identified anyone at the company that downloaded or installed Ubiquiti firmware on M-series devices.

4. Cambium has not identified individuals at the company that installed or tested Elevate firmware on Ubiquiti devices.

5. Cambium has not identified all individuals at the company involved in hacking Ubiquiti devices at live demonstrations, at customers and otherwise at the company.

6. Cambium has not identified individuals who made decisions to violate Ubiquiti's copyrights and trademarks and create false promotional materials encouraging hacking Ubiquiti firmware with Elevate.

7. Cambium has not identified any individuals who evaluated Ubiquiti's firmware license agreements and whether actions taken by Cambium violate of those agreements.

8. Cambium has not identified individuals responsible for maintaining the lab of Ubiquiti equipment and firmware pictured in Cambium's webinars promoting hacking Ubiquiti's M-series devices.

9. Cambium has not identified individuals with knowledge of Cambium's licensing program to license Elevate to Ubiquiti customers.

10. Cambium has not set forth any facts related to the timeline and individuals involved in reverse engineering and hacking Ubiquiti's firmware and bringing Blip and Wincomm into the program to promote and license Elevate. Cambium states no facts about its unauthorized downloading and use of Ubiquiti's firmware, or Elevates copying and unauthorized use of portions of Ubiquiti firmware after Elevate hacks Ubiquiti devices.

11. Cambium's affirmative statements suggesting that Elevate erases and replaces Ubiquiti's firmware is false. Cambium needs to fix these false statements and provide the actual underlying facts.

Wincomm

12. Wincom has not identified all individuals who were involved in its live hacking demonstrations of Ubiquiti's firmware with Elevate.

13. Winncom has not stated any facts related to its hacking of Ubiquiti firmware, promotion and licensing of Elevate to Ubiquiti customers.

Dmitry Moisev, Sakeed Ahmed

14. Defendants Dmitry Moisev, Sakeed Ahmed have not provided facts regarding their communications and involvement in reverse engineering and violating Ubiquiti's firmware license agreements, violating Ubiquiti's copyrights in firmware, the extent of their involvement in hacking the Ubiquiti firmware with Elevate and the false advertising and promotion of Elevate.

The categories of documents identified are deficient, and must include at least the following documents in each Defendant's possession, custody or control:

Ubiquiti AirOS firmware for M-series devices that each Defendant has accessed, copied and/or used.

Communications regarding Ubiquiti firmware or devices and Elevate internally at each Defendant, among and between Defendants and with third parties.

Log files of downloads of Ubiquiti firmware by each defendant.

Copies of all or portions of Ubiquiti firmware code.

All intermediate work product created in deriving Elevate.

All memos and communications regarding Ubiquiti's license agreements.

All memos or communications on the propriety of developing and using Elevate on other manufacturer's hardware including Ubiquiti M-series devices.

Documents on the development, configuration and functionality of Elevate.

Documents on hacking Ubiquiti m-series devices with Elevate and the number of installs of Elevate and customers affected.

Documents on market share, business plans and promotions involving Elevate and all sales associated with elevate.

Documents on licenses to customers of Elevate

Thanks—
Beth


**Beth Herrington**
**Morgan, Lewis & Bockius LLP**
77 West Wacker Drive | Chicago, IL 60601
Direct: +1.312.324.1445 | Main: +1.312.324.1000 | Cell: +1.312.543.8291 | Fax: +1.312.324.1001
beth.herrington@morganlewis.com | www.morganlewis.com
Assistant: Rhoda Morris | +1.312.324.1157 | rhoda.morris@morganlewis.com

---

**From:** Fieweger, James P (35849) <jpfieweger@michaelbest.com>
**Sent:** Wednesday, December 12, 2018 1:34 PM
**To:** Herrington, Beth <beth.herrington@morganlewis.com>
**Cc:** hop.guy@BakerBotts.com; jon.swenson@bakerbotts.com; Gollwitzer, Arthur III (73161) <agollwitzer@michaelbest.com>
**Subject:** Call

[EXTERNAL EMAIL]


Beth
Let me know if there is a time Friday after 11:00 CST that we can talk to address (1) the sufficiency of Ubiquiti's initial disclosures and (2) applying the amended MIDPP order to our case.

# James P. Fieweger
**Partner**
**E** jpfieweger@michaelbest.com
**T** 312.596.5849 | **M** 312.259.4913 | **F** 312.222.0818



Michael Best & Friedrich LLP    A LexMundi Member
my bio | our firm | vCard


Email Disclaimer
*************************************************************
The information contained in this communication may be confidential, is intended only for the use of the recipient(s) named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any

of its contents, is strictly prohibited. If you have received this communication in error, please return it to the sender immediately and delete the original message and any copy of it from your computer system. If you have any questions concerning this message, please contact the sender.

DISCLAIMER
This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and as such privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

# EXHIBIT 3

1
2

```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION
```

3

4

5

6

7

8

9

10

```
UBIQUITI NETWORKS, INC.,          )
                                  )
                Plaintiff,        )
                                  )
-vs-                              )   Case No. 18 C 5369
                                  )
CAMBIUM NETWORKS, INC.,           )
CAMBIUM NETWORKS, LTD.,           )
BLIP NETWORKS, LLC, WINNCOM       )
TECHNOLOGIES, INC., SAKID         )
AHMED, and DMITRY MOISEEV,        )   Chicago, Illinois
                                  )   December 11, 2018
                Defendants.       )   9:10 a.m.
```

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                  TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE GARY FEINERMAN

APPEARANCES:

For the Plaintiff:        MORGAN LEWIS & BOCKIUS, LLP
                          BY:  MR. ROBERT C. BERTIN
                          1111 Pennsylvania Avenue, N.W.
                          Washington, DC  20004-2541
                          (202) 373-6672


                          MORGAN LEWIS & BOCKIUS, LLP
                          BY:  MS. ELIZABETH B. HERRINGTON
                          77 West Wacker Drive
                          5th Floor
                          Chicago, Illinois  60601
                          (312) 324-1000



Court Reporter:

                  CHARLES R. ZANDI, CSR, RPR, FCRR
                      Official Court Reporter
                   United States District Court
              219 South Dearborn Street, Room 2128
                    Chicago, Illinois  60604
                 Telephone:  (312) 435-5387
             email:  Charles_zandi@ilnd.uscourts.gov
```

1    APPEARANCES:   (Continued)

2    For the Defendants:        BAKER BOTTS, LLP
                                BY:   MR. HOPKINS GUY
3                                     MR. JON V. SWENSON
                                1001 Page Mill Road
4                               Bldg. 1, Suite 200
                                Palo Alto, Caliifornia  94304
5                               (650) 739-7510

6                               MICHAEL BEST & FRIEDRICH, LLP
                                BY:   MR. JAMES P. FIEWEGER
7                               444 West Lake Street
                                Suite 3200
8                               Chicago, Illinois  60606
                                (312) 222-0800

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  (Proceedings heard in open court:)

2      THE CLERK:  18 C 5369, Ubiquiti Networks, Inc., v.

3  Cambium Networks, Inc., et al.

4      MS. HERRINGTON:  Good morning, your Honor.  Beth

5  Herrington on behalf of plaintiff Ubiquiti.

6      MR. BERTIN:  Rob Bertin on behalf of Ubiquiti.

7      MR. FIEWEGER:  Good morning, your Honor.  Jim

8  Fieweger on behalf of Cambium.

9      MR. GUY:  Hopkins Guy, Baker Botts, for Cambium.

10     MR. SWENSON:  Jon Swenson from Baker Botts also for

11 Cambium.

12     THE COURT:  Good morning.  So, we're here for a

13 status hearing, and there's also a fully briefed motion to

14 dismiss.  Were the parties able to serve their mandatory

15 initial disclosures last week?

16     MR. GUY:  Yes, your Honor.

17     MS. HERRINGTON:  Yes, your Honor.

18     MR. BERTIN:  Yes.

19     THE COURT:  Any issues that you need to raise with

20 me?

21     MR. GUY:  Yes, your Honor.

22     THE COURT:  Okay.

23     MR. GUY:  They listed only one witness, your Honor.

24 Despite a -- some 69-page claim with 398 paragraphs in it,

25 they only listed one migrating employ.  They did not list the

1  author of any copyright, nor did they list any witness who had
2  any knowledge of any of the contracts in the case.

3       So, they've listed one witness, your Honor, and
4  they've indicated that there is -- that they will indicate
5  on -- designate an expert in the future.

6       We think this is rather unusual because I think that
7  the entire motion to dismiss is -- the last question the Court
8  had, "Can't this be done with discovery," I think the point is
9  we don't even have a named witness who has knowledge or
10 discoverable information regarding their copyrights, their
11 contracts, or any of these things, other than this one
12 employee.

13      THE COURT:  Okay.  Have you had a chance to talk with
14 the plaintiff about this issue?

15      MR. GUY:  It's been raised, your Honor, but it was
16 filed about a week ago, I believe -- actually, six days ago.

17      THE COURT:  Okay.  So, are you -- have you reached
18 out to the plaintiff?

19      MR. GUY:  Yes, we have.  We've objected, and it is in
20 process; but that is the current status of it, your Honor.

21      MR. BERTIN:  This is the first we've heard of that.
22 We're happy to supplement and provide additional people, but I
23 had no idea that -- that they had this objection.

24      MR. GUY:  Well, we do have this objection, your
25 Honor.  I thought my office had communicated that objection.

1      THE COURT:  All right.

2      MR. GUY:  I have the disclosure with me.  It's clear

3  that they only listed one -- they listed basically our

4  defendants, individuals, and they listed this one witness; and

5  they did not list -- I don't think that's in dispute.  They

6  did not list the author of any copyright, any source code, nor

7  did they list anybody who has knowledge, firsthand knowledge

8  of negotiating the GNU license or negotiating any of their

9  licenses.

10     THE COURT:  Okay.

11     MR. BERTIN:  We can certainly identify developers in

12 a supplemental disclosure that we send to the other side.

13     THE COURT:  And so under the -- you may be operating

14 under a Rule 26(a)(1) frame.  Yeah, 26(a)(1) requires the

15 parties to disclose anybody that they intend to use, any

16 witness that they intend to use to support their claims or

17 defenses.  And maybe you just want to use one person, and

18 that's fine.

19     But the MIDP disclosures are broader than that, and

20 they require not just the people that you want to use, but

21 also anybody with knowledge of -- you know, material knowledge

22 of the material underlying facts.

23     So, I don't know.  Maybe Ubiquiti's a one-person shop

24 and there's just one person; but if not, you'll probably want

25 to supplement.  It's premature at this point for me to give a

1  ruling, and I haven't been asked for a ruling; but I imagine
2  you'll be having discussions in the near term about that.
3         MS. HERRINGTON:  Certainly.
4         MR. GUY:  Yes.
5         THE COURT:  Anything else about the MIDPs that we
6  need to discuss?
7         MR. GUY:  Your Honor, I do want to make sure that
8  we're clear.  We have an amendment to the MIDP rules.  We
9  would prefer that our -- that any disclosure, further
10  disclosure be done, I think it's 40 days after the ruling on
11  this motion.  I think we would ask that we be underneath the
12  recent amended rule change.
13         MR. BERTIN:  Sorry.
14         THE COURT:  Yes, go ahead.
15         MR. BERTIN:  Okay.  The only thing I would say is
16  that, you know, similarly, under their disclosures, they
17  haven't identified anybody that works at the company that has
18  written any source code for the company.  So, the same thing
19  is present in their disclosures.
20         They have identified three people at an Eastern
21  European software shop; and just in terms of the status
22  conference, if they're the only people that worked on the
23  code, I just want to be mindful of that from a scheduling
24  standpoint because we may be doing Hague -- Hague discovery
25  and things like that.

1       But I thought that they might have had the director

2  of engineering or, really, anybody else at Cambium as part of

3  the disclosures, and they weren't there.  So, I don't know how

4  much discovery we're going to be doing in Eastern Europe.

5       THE COURT:  All right.

6       MR. BERTIN:  And I assume that there's somebody at

7  the company that has been involved in software development.

8  We'll be talking about that as well.

9       MR. GUY:  Your Honor -- I'm reading from our

10  disclosures here.  One of the named defendants, Sakid Ahmed,

11  and Dmitry Moiseev were both indicated as they have

12  information relevant to the high-level development of the

13  Elevate firmware and related installation process.  And same

14  with respect to Moiseev likely has information relevant to the

15  engineering design and operation --

16       THE COURT:  If you can slow down just a little bit

17  for our court reporter.

18       MR. GUY:  Okay.  So, the operation of Elevate

19  firmware and related installation process.

20       So, the design was done.  It did go out to the

21  Ukraine for implementation, and I would agree with counsel

22  that we are going to have some issues with discovery in the

23  Ukraine.  I mean, they are not -- we do not have control over

24  them.

25       THE COURT:  Are they employees of Cambium?

1          MR. GUY:  No.

2          THE COURT:  But they're vendors of Cambium?

3          MR. GUY:  They did -- we did pay them in order to do

4     the code, yes.  They were outsourced.

5          THE COURT:  Is there an ongoing relationship?

6          MR. GUY:  There is something of a relationship, and

7     we are attempting to reach out to them at this point; but we

8     have not gotten confirmation that they will make these

9     witnesses available and provide us the documentation.

10         THE COURT:  Okay.  Well, we'll cross that bridge when

11    we come to it, but if you -- if Cambium has some sort of

12    ongoing relationship with these Ukrainian coders, I have to

13    imagine that the Ukrainian coders would cooperate as a

14    condition of a continuing relationship with Cambium.  And that

15    may be how we do it.  In other words, ultimately, it may be on

16    Cambium to grease the wheels as to the non-parties with whom

17    it continues to have a business relationship; but again, we're

18    not quite there yet.

19         So, anything else about -- so, we had the request for

20    putting off the MIDP disclosures -- or at least the production

21    of documents until 40 days or 30 days after the resolution of

22    the motion to dismiss.  It raises -- it sounds like a simple

23    request, and it is, viewed through a certain lens.  At the

24    same time, the purpose of the MIDP is not to create a

25    PSLRA-type regime for discovery, where there's an effective

1   discovery stay pending resolution of a motion to dismiss.

2           So, I don't want -- what I don't want to happen is

3   that there's no discovery or no document discovery pending

4   resolution of the motion to dismiss because that would mean

5   that under the MIDP, there's less discovery rather than more

6   discovery, and that's just -- was not the purpose of the MIDP

7   or the amendment to the MIDP.

8           So, maybe the solution is that formal MIDP document

9   production doesn't take place, but everything else is fair

10  game, absent a further order of the Court.

11          And there are some circumstances pre-MIDP in

12  non-PSLRA cases where there was a motion to dismiss and a

13  request to stay discovery pending resolution of the motion to

14  dismiss where it made sense to do that, so I'm not saying it's

15  impossible or out of the question.  But it would require -- it

16  would require a motion and a showing why this case is

17  different, is not -- is different from most other cases in

18  terms of having a motion to dismiss proceed simultaneously

19  with ordinary discovery on the assumption that the MIDP

20  disclosures will be put off.

21          So -- and the amendment is new, so all of this hasn't

22  really been worked out yet.  So, I guess the bottom line is

23  figure out what you'd like and -- in terms of not just MIDP,

24  but also ordinary discovery; and file a motion requesting the

25  relief that you want, although not until you talk with the

1  plaintiff and get the plaintiff's view.  And maybe it's an

2  agreed motion.  Maybe it's not.  But I would do the Local

3  Rule 37.2 consultation before any -- any such motion is filed.

4          So, anything else about discovery or MIDPs?

5          MR. GUY:  None from the defendants, your Honor.

6          MR. BERTIN:  None from the plaintiffs, your Honor.

7          THE COURT:  So, let's go to the motions to dismiss.

8  I'm going to give the plaintiff a chance to have the first

9  word here in court, given that the defendants had the last

10  word in writing during the briefing schedule.  Let me just --

11  for what it's worth, and it may not be worth anything, let me

12  give you my tentative thoughts.  And it's not really a bottom

13  line thought.  It's more of a process thought.

14          What I read as the main thrust of the motion to

15  dismiss, so it was definitely the lead of the motion to

16  dismiss, was the complaint is alleging just deletion of

17  software, not modification or copying.  None of the law --

18  statutes or common law doctrines asserted by the plaintiff

19  prohibits deletion; and, therefore, the complaint doesn't

20  allege a violation of law.

21          That was really the main thrust of -- at least from

22  my view, the main thrust of the motion.  Then in the response

23  brief, the plaintiff said, "What are you talking about?  The

24  complaint doesn't just allege deletion.  It also alleges

25  modification and copying, and here's why modification and

1    copying is covered by the Copyright Act and all of the other
2    doctrines that were -- the legal theories that were set forth
3    in the complaint."

4          And then in the reply brief, the defendant said,
5    "Well, you're forgetting about the GPL, the general public
6    license; and the general public license allows us not just to
7    delete, but also to modify and copy."

8          I think the GPL was discussed in the opening brief;
9    but if it was intended to be the lead, and I think it turned
10   out to be the lead, at least in the reply brief, the lead was
11   a bit buried in the opening brief.

12         But that said, I don't think it was forfeited.
13   I think it was presented in the opening brief.  And I'm
14   wondering if the plaintiff can address the arguments in the
15   reply regarding the GPL, as well as anything else that you'd
16   like to address.

17         MR. BERTIN:  Yes.  Thank you.  Thank you, your Honor.
18   We are sort of having a big merits dispute on the complaint at
19   this stage; and, you know, we think for all of the reasons
20   stated in our opposition that there's sufficient factual
21   allegations to establish, notwithstanding the GPL,
22   infringement.

23         On your specific question about GPL, essentially,
24   what they've argued in the reply is that because there's some
25   GPL code on this embedded device's firmware, that that excuses

1　all conduct with respect to the whole of the program.  And

2　they've also alleged that that's the case in part because we

3　haven't allegedly identified anything that's proprietary

4　within the firmware, but that's not the case.

5　　　　So, we've identified a user interface that's

6　proprietary.  And, for example, Exhibit J to the complaint

7　shows our proprietary user interface.  We've talked about the

8　user interface in the complaint and --

9　　　　THE COURT:  Is the user interface separate and apart

10　from the software or from the firmware that Ubiquiti installs

11　on the hardware?

12　　　　MR. BERTIN:  It's part of the installation of the

13　hardware, user interface code, but it's a distinct program

14　from other programs that are part of the firmware, much like

15　Microsoft Office has Microsoft Word and Power Point and other

16　things, and even Microsoft Windows has multiple programs like

17　printer drivers and display drivers and other things that are

18　distinct.

19　　　　And, for example, with respect to copyright

20　infringement, they point only to their use of Elevate and its

21　copying and modifying of certain things as being excused by

22　the GPL; but the complaint also alleges copyright infringement

23　by their violating the license agreement and then continuing

24　to use and demonstrate the Ubiquiti program itself in live

25　hacking demonstrations showing how to install Elevate.  And

1    during those demonstrations, for example, in the webinar,

2    they're publicly displaying and publicly performing the user

3    interface software, our user interface software, and showing

4    people how to bring it up and then download the Elevate

5    software and then type that in to our user interface.

6            So, that's just one example of the part of the code

7    that is infringed, and it's something that we keep kind of

8    harping on; but they try to indicate narrowly what the

9    copyright infringement is.

10           THE COURT:  Does the user interface code incorporate

11   at all the public use code?

12           MR. BERTIN:  No.

13           THE COURT:  But there are parts of the Ubiquiti

14   firmware that does incorporate the public use code?

15           MR. BERTIN:  Parts of the firmware on the device,

16   yes.  For example, there's a Linux-type kernel on the device.

17   Many companies make proprietary software for embedded devices

18   that run on Linux, and Ubiquiti is no different.  They make --

19   they use leveraged Linux, and they also have programs that run

20   on Linux that are distinct.

21           THE COURT:  So, is Cambium right that if you take

22   public source software and create something with it, whatever

23   it is you create also has to be public source, and there's --

24   you basically grant the license to everybody to use it?  Isn't

25   that kind of the whole point of open source software?

1      MR. BERTIN:  That's not the whole point of open

2  source software *per se*.  It is in part.  Like, for example, if

3  you make an open source program and then I want to make an

4  improved program, anything I do to that program that you've

5  put out there in open source, anything I do to modify that

6  program is going to be open source, and I'll have no claim

7  to it.

8      But this is a multi-billion-dollar industry now, with

9  people introducing, you know, proprietary, you know, code that

10  works with open source code and so forth.

11      And what it comes down to -- and their brief kind of

12  conflates some of these issues, but for example, Ubiquiti can

13  add to the open source code by creating an entirely new

14  program and then release it to be part of the open source

15  program so that it works together with the program.  So,

16  they'll own the copyright in that, but then they've licensed

17  it to the world by combining it with these other programs.

18  Okay?

19      But they can also modify somebody else's program

20  that's included in open source work, and then Ubiquiti would

21  actually own those modifications; but nevertheless, they'd be

22  subject to open source licensing.

23      And then Ubiquiti and others can create new

24  proprietary programs that are distinct from open source that

25  maybe run on top of Linux that they'll own because they're

1  distinct programs.

2  And if you look at the -- we have this in a couple of
3  footnotes in our opposition brief, but if you look at the --
4  each of the open source licenses that defendants attach to
5  their motion, each of them addresses this -- this issue.  And
6  what they basically say is that mere aggregation of a work,
7  of a program with an open source program -- yeah, here it is.

8  So, if you look at Exhibit 5, which is the GPL
9  version, too, at the very bottom of page -- at the very bottom
10 of page 2, which is in Section 2 of the license, it says, "In
11 addition, mere aggregation of another work not based on the
12 program with the program or with a work based on the program
13 on a volume of storage or distribution medium does not bring
14 the other work under the scope of this license."

15 And that's powerful because it allows people to --
16 to leverage open source, make contributions to open source,
17 but also keep some programs separate that also leverage that
18 open source, and so --

19 THE COURT:  So, let's just get down to brass tacks.
20 So, what you're saying is that -- what I think you're saying
21 is that -- and please tell me if I'm wrong -- that the Cambium
22 software at issue in this case, some of it is derivative of
23 the public source software, and that stuff is not protected
24 because of the GPL; but there are other programs as part of
25 the suite of software programs that are not derivative of the

1  GPL and simply because those non-GPL-derivative programs --
2  I'm sorry, yeah, non-public-source-derivative programs are
3  presented together with public-source-derivative programs
4  doesn't mean that the GPL creates a license to use the
5  non-public-source-derivative programs?
6            MR. BERTIN:  Yes.
7            THE COURT:  Okay.  So, what are the
8  non-public-source-derivative programs in Cambium's suite of
9  software that's at issue in this case?  You've told me one,
10  which is the proprietary user interface.  What's another one?
11            MR. BERTIN:  Well, so, there's two -- there's two
12  separate factual scenarios, if I can -- one is what their code
13  includes from our code, let's say, or that's not part of GPL.
14  And the other is what our code includes that's not part of the
15  GPL.
16            So, the user interface is one.  There's two things
17  that are specifically pled in our complaint, the configuration
18  code and the calibration code.  Those are two things that we
19  allege are not part of the -- are not part of the GPL, and
20  we've alleged that Cambium has copied those and made
21  unauthorized use and access to those things.
22            Cambium has not disputed that those are not part of
23  the GPL.
24            THE COURT:  Then where does the proprietary user
25  interface code fit in?

1        MR. BERTIN:  That's something in our code, but it's

2    not in their code; but they commit copyright infringement

3    every time they publicly perform or publicly display our user

4    interface after breaching --

5        THE COURT:  And that's alleged in the complaint?

6        MR. BERTIN:  That's alleged in the complaint.

7        THE COURT:  And then in terms of the configuration

8    code and the calibration code, this is something that you're

9    saying that Cambium incorporated into its own code?

10        MR. BERTIN:  Yes.  Yeah, they directly copied the

11    configuration --

12        THE COURT:  So, we have the public performance of the

13    proprietary user interface during the webinars or the

14    seminars?

15        MR. BERTIN:  Right, right.

16        THE COURT:  And is there anything else that your

17    complaint alleges that is publicly performed but not

18    incorporated in the Cambium software?

19        MR. BERTIN:  In terms of the public performance

20    rights, that's the main thing.

21        THE COURT:  Okay.  So, that's one bucket, and there's

22    one item in that bucket, which is proprietary user interface.

23    The second bucket is your code that you say Cambium

24    incorporates into its own code, but your code is not covered

25    by the GPL.  And you've given me two examples, the

1  configuration code and the calibration code.  Yes?

2          MR. BERTIN:  Yes.

3          THE COURT:  Are there any other examples?

4          MR. BERTIN:  Yeah.  Another example is the

5  proprietary AirMAX protocol that's mentioned in the complaint,

6  and then there's everything else.  But those are specifically

7  called out as proprietary portions.

8          And again, every time that they, for example, use

9  our code, our whole firmware after breaching the license

10  agreement, they're -- they're making unauthorized use of our

11  copyrighted code; and that's an act of copyright infringement.

12          THE COURT:  Okay.

13          MR. BERTIN:  But those are the four matters.

14          THE COURT:  If -- what is the proprietary user

15  interface software?  Could you go to the code and say, "Okay.

16  These 1s and 0s are proprietary user interface"?

17          MR. BERTIN:  Yes.

18          THE COURT:  And can you go to your code and say,

19  "Here are the 1s and 0s that's configuration code, and here's

20  the 1s and 0s that are calibration code"?

21          MR. BERTIN:  Yes.  They're the same.

22          THE COURT:  Do any of your claims depend on things

23  that are done to your code that is derivative of the public

24  use code?

25          MR. BERTIN:  None of our claims depend on that.  We

1  haven't asserted any GPL code, and we're not interested in

2  asserting any GPL code.  There's plenty of proprietary --

3          THE COURT:  I'm not talking about GPL code.  You're

4  changing my question.

5          MR. BERTIN:  Okay.  I'm sorry.

6          THE COURT:  I'm talking about stuff that you did that

7  is derivative of GPL code.

8          MR. BERTIN:  Yeah, we're not asserting it.

9          THE COURT:  You made it better --

10         THE COURT:  Right.

11         MR. BERTIN:  So you created a new thing.

12         MR. BERTIN:  Right.

13         THE COURT:  But you're not saying this new thing has

14  been infringed in any way?

15         MR. BERTIN:  Yes, I agree with that characterization

16  as to that category.

17         THE COURT:  Okay.  I think now I understand what the

18  nature of your claim is and how you believe you defeat both of

19  their principal arguments, which is:  One, all we have is

20  deletion, not modification or copying; and two, even if there

21  is modification and copying, it's covered by the GPL.

22         MR. BERTIN:  Yeah.

23         THE COURT:  And is that basically the gist of your --

24         MR. BERTIN:  That's basically the gist it, your

25  Honor, yeah.  If I could add one more thing.

1     THE COURT:  Sure.

2     MR. BERTIN:  And this just illustrates these issue,

3  but also having play into some other things.  The

4  configuration code and the calibration code, they haven't

5  disputed that those are ours and not infected, let's say, with

6  the GPL.

7     What they've said with respect to those things is

8  that they're essentially primarily functional and, therefore,

9  not subject to copyright.  At the same time, they've argued

10  various preemption claims and things like this.  But if

11  they're asserting that the part of the code that they copied

12  is not subject to copyright protection, then how can they be

13  preempted by the copyright laws?

14     So, generally, preemption is something that's rarely,

15  if ever, considered at this stage of the case, because it's

16  the kind of thing where you need to wait to look at the actual

17  1s and 0s of each program that are alleged to infringe and the

18  extent of copying and this and that, and the extent of

19  arguments that, "Well, this isn't really copyrightable."

20  Well, then other things come into play.

21     We've alleged several reasons why preemption is not

22  applicable, but that's just one example of why at this early

23  stage it would be difficult to show preemption.

24     THE COURT:  Okay.  All right.  Thanks.  Before I turn

25  the microphone over to Cambium, sir, do you have a case that

```
 1   was called -- do you have a case that was supposed to be
 2   called at 9:00 o'clock?
 3             MR. REDMOND:  Thomas v. Dart.
 4             THE COURT:  Okay.  Let's take a very quick break.
 5   You can collect your thoughts.
 6             So, why don't we call Thomas v. Dart.
 7     (Recess had.)
 8             MR. GUY:  Re-approach, your Honor?
 9             THE COURT:  Yeah.  We'll resume with Ubiquiti versus
10   Cambium.
11             All right.
12             MR. GUY:  Thank you, your Honor.  Let me take those
13   arguments in order, if I may.  First of all, with respect to
14   the interface, if that -- if they are -- if they're saying
15   there are two copyright contract breaches here, and one of
16   them is the interface, then at paragraph 44 of their
17   complaint, they say, "The hacked firmware deletes portions of
18   Ubiquiti firmware and Ubiquiti user interfaces with Ubiquiti
19   M-series devices."  So, in a motion to dismiss, that's taken
20   as true, and we agree that it does delete it.
21             So, if they are saying that they have some right in
22   the interface and it's a demonstration right under the
23   copyright or a performance right that they're saying that we
24   are in violation of that, then we would gladly accept their
25   amendment to that, and that will trigger a very specific
```

1  attack, again, under Section 109(a) of the Copyright Act, that

2  the Copyright Act cannot first of all give us the broad right

3  to delete, yet if we show people how to delete it, that's

4  somehow in violation of some other right.  They have no right

5  to control that.  And that's exactly where we'd be on that

6  issue.

7          But at a first step, you know, we would love to see

8  the amendment in which they restrict their claim to those two

9  points, one of them being the interface and the deletion

10  issue, and the second being some new code that they have with

11  regard to the configuration and I believe it was the -- they

12  referred to it as the calibration code.

13          So, let me get --

14          THE COURT:  So, let's -- can we just focus on the

15  user interface for a second?

16          MR. GUY:  Sure.

17          THE COURT:  So, defense counsel is saying that

18  the principal allegation regarding the user interface is

19  paragraph 44, and all it alleges is deletion.  Is there

20  something else alleged as to the user interface in the

21  complaint that counsel has not addressed?

22          MR. GUY:  There is.

23          THE COURT:  And if so, where is it?

24          MR. GUY:  There is other mention of the interface,

25  but their admission that it is deleted is full stop under

1   Section 109.  We have the right to delete it.

2          THE COURT:  Well, no.  Just because I say you punched

3   me in the face doesn't mean that you also didn't kick me in

4   the leg.

5          MR. GUY:  But that would be a different right, your

6   Honor.

7          THE COURT:  Paragraph 44 says that there's deletion

8   of a portion of the user interfaces.  Maybe the complaint

9   alleges that other things are done with the user interfaces.

10  So, is there anything else that the complaint alleges that

11  Cambium does with the user interfaces?

12         MR. BERTIN:  There's a lot of stuff that the

13  complaint alleges that Cambium does with the user interfaces,

14  but -- they allege the webinar --

15         THE COURT:  So, paragraph numbers.

16         MR. BERTIN:  Well, let's see.  I want to start with

17  the actual copyright infringement, the fourth claim for relief

18  at page 53 of the complaint at paragraph 284.  And it says,

19  "Cambium has directly infringed and will continue to infringe

20  Ubiquiti copyrights and Ubiquiti firmware by violating

21  Ubiquiti firmware license by making unauthorized copies and

22  use of Ubiquiti firmware."

23         THE COURT:  If that's what you're relying on, it's

24  not going to get you where you need to go because that's just

25  a conclusory allegation -- two problems with it.  One is it

1   doesn't reference the user interface, and second, it just is a
2   conclusory allegation of copyright infringement.
3           MR. GUY:  We agree, your Honor.
4           If you could refer to the paragraph number.
5           MR. BERTIN:  Yeah, thank you for that.
6           So, there's a whole section here, paragraph 62
7   through 71, where we talk about Cambium's unlawful promotion
8   and distribution of the hacked firmware.  And, you know, here,
9   we talk about the materials where we induce them to make --
10  you know, to make modifications.  Let's see here.
11          Yeah.  So paragraph 71, "Cambium has continued to
12  heavily promote the hacked firmware in the United States or
13  elsewhere with additional webinars directed at WISPs and
14  marketing and distribution of literature and web pages through
15  third-party distributers, including distributors used by both
16  Ubiquiti and Cambium."
17          THE COURT:  But again, there's nothing here about the
18  interface.
19          MR. BERTIN:  Well, if -- I can continue to go through
20  this for a minute, but there's -- we -- we basically -- the
21  primary allegations in here are that in promotion that they've
22  done live -- live hacking, and --
23          THE COURT:  Of what?  Of the stuff that's covered by
24  the GPL or the other stuff?
25          MR. BERTIN:  No, the user interface.

1           THE COURT:  But you've got to allege that.

2           MR. BERTIN:  It is alleged in here.

3           THE COURT:  Well, show me.  I'm giving you a chance.

4  Show me.

5           MR. BERTIN:  So, paragraph 160 is another example.

6  So -- and there's -- okay.  So, we talk about in this -- the

7  fifth bullet, "Cambium's November 30th webinar designed to

8  target Ubiquiti customers and provide a step-by-step procedure

9  for hacking the Ubiquiti M-Series firmware, which prominently

10  feature these two defendants which contain numerous

11  admissions."  Okay.  And then we also talk about Winncom

12  hosting an ePMP course, October 7th through 9th, at the

13  WISPAPALOOZA 2017 convention.

14           We have also attached a transcript of that webinar to

15  the complaint.  Okay?  And let me try to find the exhibit.

16  This is a partial transcript, Exhibit F to the complaint,

17  where they -- and we've also attached the quick-start guide to

18  the complaint, which is at Exhibit D.  And the webinar refers

19  people to this quick-start guide, and they talk about

20  downloading the firmware, using a web browser to navigate to

21  the -- this is on page -- this is on page one, two -- 3 of

22  Exhibit D to the complaint, the quick-start guide, "Using a

23  web browser, navigate to the access point's default IP

24  address, 192.168.0.1.  Log in to the access point web

25  management interface with username admin and password admin.

1   Navigate to Tools, Software, Upgrade, and click the Browse
2   button."

3          So, this is an example of the webinar going into our
4   device's user interface and instructing people how to apply
5   Elevate to it.  And all of that is instructing people to use
6   our user interface, and they're using our user interface at
7   the time.

8          MR. GUY:  If I may comment, your Honor.

9          THE COURT:  Sure.

10         MR. GUY:  So, your Honor, the massive problem that we
11  have, as this demonstrates, is you're picking paragraph 71 and
12  matching it with paragraph 160 and going back to Exhibit D.
13  And in between all of that is a much, much, much broader
14  claim.  If they amend to this idea of a performance -- and
15  what I'm hearing is that they're objecting to the fact that we
16  show their user interface on page 3 and I guess page 4.  If
17  that's the nature of their copyright claim, then all of a
18  sudden, we have a very narrow and very specific claim.  And we
19  would invite that.  We would appreciate the amendment and to
20  focus it on that.  But that's not what we have in this
21  complaint.

22         Let me give you an example how this affects discovery
23  since the pleading will frame discovery.  If the issue is
24  Exhibit D and this interface and not the code behind it, we
25  can say very easily that instructing someone how to delete

1    something is perfectly permissible.  If showing them a picture

2    of their interface is the violation, then we delete the

3    violation.  Damages are limited to that -- that picture, and

4    that's it.  But the way they have it right now is it's

5    everything.  It's all of their code.  And I can demonstrate

6    that to you.

7            So, the question is:  Do I have to produce millions

8    and millions of lines of code, or do I need to simply produce

9    Exhibit D?

10           THE COURT:  Well, the millions and millions of lines

11   of code will come in the second bucket, which is the

12   configuration code and the calibration code.

13           MR. GUY:  I'm chomping at the bit.  Can I go ahead

14   and proceed with that?

15           THE COURT:  Let me ask, is there anything else in the

16   complaint that you believe alleges public performance of the

17   user interface?

18           MR. BERTIN:  Well, paragraph 24 talks about the user

19   interface, which provides an upgrade path for the firmware.

20           MR. GUY:  Paragraph 24?

21           MR. BERTIN:  Paragraph 24.

22           THE COURT:  That doesn't allege public performance.

23           MR. BERTIN:  Paragraph 37 -- well, we've alleged

24   unauthorized use of the code and the copyrights.

25           Paragraph 37 gets into devices, including user

1   interface, for Ubiquiti customers to configure.  User

2   interface is accessed at the designated IP address.  On the

3   first access, they're presented with a license agreement.

4          THE COURT:  And the thing is -- I understand that

5   you're -- as a plaintiff, you're in a tough position, because

6   if you give too little, then you have a *Twombly/Iqbal* problem;

7   if you give too much, it's confusing.  And you've got to --

8   it's hard to deal with those competing imperatives.

9          But at the same time, it can't be a scavenger hunt to

10  kind of figure out what your claim is.  That causes a Rule 10

11  problem.

12         MR. BERTIN:  I understand what you're saying.  At the

13  same time, I feel like we provided more information, not less.

14  And we establish in our copyright count section, we're

15  alleging direct infringement for unauthorized use of our --

16  you know, of our copyrighted firmware, in addition to

17  indirect, contributory inducement.  And it's all laid out.

18         And with respect to everything in here, you know, you

19  can't -- deleting the user interface is a -- is a breach of

20  our license agreement, and it says that in here on multiple

21  cases.  We've quoted the language that says that.  So,

22  deleting it is a breach of the agreement.  That creates

23  copyright infringement just by their continuing to have the

24  code.

25         The next section that we cited of the license

1   agreement says once you breach the agreement, you have to

2   destroy all copies of our code.  You can't keep it around.

3   So, anything that they're still keeping is copyright

4   infringement.

5          And it's not their code that they have to go fumbling

6   around trying to find.  It's our code.  They're keeping our

7   code.  So, the copyright comparison is our copyright against

8   our own code that they're keeping and using and our user

9   interface and are they using it.  And that's what's in here.

10   We're alleging direct, that they're infringing our code and

11   that they're breaching and that they're still using it.  So,

12   it's not -- we were not playing hide the ball, and I think

13   that's very clear from here.

14          Now, do you have a requirement under the copyright

15   pleading rules to specifically mention public performance and

16   public display as one of the nine or so bundle of enumerated

17   copyrights?  I'm not familiar with any case that says that.

18          What you do is you allege facts, and you allege

19   direct copyright, inducement, or contributory.  And we've done

20   that, and we've done that in spades; and I've given you

21   multiple examples.  And I don't think that not saying "public

22   performance" or "public display" is a deficiency, and I'm not

23   aware of any case that says that it is.

24          THE COURT:  Well, you don't have to utter -- a

25   complaint doesn't have to set forth legal theories.  That's

1    right.  But you do have to explain factually what it is that

2    the defendants did to violate the copyright or the DMCA or

3    whatever it is that you're alleging.

4        (Bench conference, not reported.)

5            THE COURT:  Okay.  We're going to take one more

6    break, and then I'm going to turn the microphone back over to

7    the defendant.

8        (Recess had.)

9            THE CLERK:  18 C 5369, Ubiquiti Networks, Inc., v.

10   Cambium Networks, Inc., et al.

11           THE COURT:  All right.  So, if there's anything else

12   you want to say about the user interface, I want to give you

13   that chance; and then I know you want to address the second

14   group of items, which is the use of the configuration code and

15   the calibration code.

16           MR. BERTIN:  Your Honor, can I just give you a couple

17   of additional paragraphs, if you don't mind.

18           THE COURT:  Sure.  Yeah, let's just get everything on

19   the table so defendants know what you're alleging.

20           MR. BERTIN:  Okay.  So, paragraph 93, this whole

21   section is right on point because it's talking about the

22   promotion of the hacked firmware.  But 93 talks about the

23   webinar, the November 30th, 2016, webinar.

24           "The webinar directs viewers of the Cambium website

25   to download the hacked firmware and provides instructions on

1    how to navigate the Ubiquiti web user interface driven by
2    Ubiquiti firmware on Ubiquiti M-Series devices in order to
3    replace the Ubiquiti firmware with Cambium hacked firmware."
4         The next paragraph talks about how in the webinar,
5    they talk about supporting XW-based Ubiquiti hardware.
6         And then paragraphs 108, they talk about Cambium
7    promoting its quick-start guide during its November 30th,
8    2016, webinar targeting Ubiquiti customers, stating that
9    Cambium strongly recommends viewers read their quick-start
10   guide.
11        And then paragraph 110 talks about Cambium releasing
12   the quick-start guide instructing Ubiquiti customers on steps
13   to download the hacked firmware from the Cambium website and
14   install it through the web user interfaces driven by Ubiquiti
15   firmware on M-Series devices.
16        THE COURT:  Okay.  All right.  The floor is yours.
17        MR. GUY:  Thank you, your Honor.  I would completely
18   agree with the Court that that is a scavenger hunt, and I want
19   you to know that I did not understand that to be the nature of
20   their copyright claim, that the idea that they are pointing to
21   a browser image as part of a copyright claim which is a
22   performance right and that that is one of their claims, that
23   is not in their complaint.  And our main focus here is the
24   overbreadth of this complaint.  And we would gladly accept an
25   amendment that goes directly to that.  And we believe that we

1  are entitled to that, and we have just demonstrated why that's
2  essential.

3        If I can move to responding to the -- what they refer
4  to as the configuration and calibration code, unless there are
5  any questions by the Court.

6        THE COURT:  No.  Go ahead.

7        MR. GUY:  Okay.  With respect to the configuration
8  and calibration code, I believe he said that three times, the
9  complaint does not refer to it as that.  It doesn't use the
10  word "code."  We just searched it.  The word "calibration
11  code," we couldn't find, nor could we find "configuration
12  code."

13        What they do call out is something called
14  configuration or calibration information.  And the point is
15  that this is something that we believe that if they were
16  required to define what that is, then they have no right
17  to it.

18        And again, we have the same problem as before, that
19  it's super broad, and we don't really -- you know, this is a
20  needle in a haystack; and we've just found perhaps what
21  they're now calling one of their needles, which is this idea
22  of configuration/calibration code.  That's different than
23  what's in their complaint.  They talk about information.  They
24  don't have a right to claim a copyright in information.

25        Now, if I can, your Honor, just so you understand

1    this overbreadth issue, we've got -- I just want to show you

2    one graphic.  It's stapled together.  If I can hand this up.

3          THE COURT:  Of course.

4      (Tendered.)

5          MR. GUY:  And so the overbreadth is that they

6    constantly refer -- if you can just refer to page 4 -- I'm

7    sorry, page 3.  And I'll be brief.  This isn't a long

8    presentation.

9          This is a quote from Exhibit B to the complaint.

10   This is their firmware license.  And if you go through the

11   complaint, what they do is they talk about Ubiquiti firmware

12   or their firmware, and they talk about it with a little "f"

13   firmware.  Then they quote -- about paragraph 37, I believe --

14   38, excuse me, they quote language from this agreement.

15         And then after that, they never define the term

16   Ubiquiti capital F Firmware in the complaint, but they start

17   using Ubiquiti capital F Firmware about 100 times after

18   paragraph 38.  And if you go to the contract they were

19   quoting, you see how broad Ubiquiti firmware is.  It means the

20   firmware in object code form made available on Ubiquiti on --

21   or Ubiquiti devices.  It's everything.

22         But in that same agreement, your Honor, they also

23   define open source software means, "Any software or software

24   component module or package that contains" --

25         THE COURT:  If you can slow down just a bit.

1          MR. GUY:  I'm sorry.  That was a perfect place to
2  slow me down.  Thank you.

3          (Continuing) -- "or is derived in any manner (in
4  whole or in part) from, any software that's distributed as
5  free software, open source software, or similar licensing,"
6  and so forth.

7          So, this is in the agreement that they attach to the
8  complaint.

9          So, at a threshold, they not only cannot claim
10  anything that is subject to a GPL license, but that means not
11  only the code that is -- you know, that they copy and is there
12  verbatim, but anything that is derived in any manner from it.

13          And so that's the overbreadth that the -- in two
14  ways.  What you just heard was a recasting of that a little
15  bit narrower.  They want to suggest that it's not -- well, it
16  could be derived, but it can be new.  Well, if they take
17  something and they derive it and it's new, it's still derived.
18  So, there is a point there.

19          You know, if we -- we would ask that the complaint
20  be limited basically by their own definition of open source
21  that anything in this case cannot include the open source
22  software.  I think you just heard him say that, but that is
23  not what's in the complaint.

24          Now, going on to the -- addressing the
25  configuration/calibration code specifically, I point out that

1    the word "code" is not there.  They talk about it in terms of

2    information.  And, you know, they don't have a copyright on

3    information.  So, if they were required to spell out

4    specifically what that is, is it code, or is it information?

5    We're now in conflict on what that is.

6          Code is not in the complaint.  Information is.  You

7    can't copyright information.  You can't copyright the phone

8    numbers for people in a phone directory.  You may be able to

9    copyright a specific font size and presentation or formatting

10   of a phone book, but you can't copyright the information.

11         So, at a point here, they've already changed, if you

12   will, what their complaint literally says.  They've switched

13   it from information in response to our motion to something

14   called code.  Well, if that's the case, then we would like to

15   see two things:  Identifying what that code is or what those

16   calibration parameters are.

17         What we believe they are is nothing more than the IP

18   address for the device, the name of the device, its power

19   setting, and things like that.  And they have no copyright.

20         So, we'd ask, you know, that they need to be more

21   specific to lay out a claim, because when they put a complaint

22   forward that simply says calibration and configuration

23   information, that is not copyright protectable under the

24   Copyright Act.

25         Your Honor, those are my comments with respect to

1  those two buckets.

2  THE COURT:  Okay.  Very good.  Any final thoughts?

3  MR. BERTIN:  Yeah.  I think it would be news to a lot

4  of people in the world if information is not copyrightable.

5  There are --

6  THE COURT:  Isn't it the expression of information

7  and not the information itself that's copyrightable?

8  MR. BERTIN:  Well, information includes -- includes

9  the expression; but, yes, expressions of information,

10  information is copyrightable.

11  THE COURT:  No.  You just said two completely

12  different things.

13  MR. BERTIN:  Well, I'm agreeing with you that an

14  expression of information is copyrightable.

15  THE COURT:  Okay.

16  MR. BERTIN:  Okay.  But -- okay.  In terms of -- in

17  terms of this being a wide-open exercise, we've asserted --

18  which it's not, we've asserted two very specific versions of

19  Ubiquiti copyrights that are infringed, the registered

20  versions 5.2.1 and 5.3.  We've -- the registrations

21  themselves, which are attached to the complaint, exclude

22  license and materials, previous versions.  And they're

23  directed to new and revised computer code.  It's not an

24  open-ended exercise.

25  And we've identified already several things.  We've

1    identified configuration and calibration information, which is

2    part of the firmware code, in our -- in our complaint.  We've

3    identified user interface in our complaint.  We've identified

4    the AirMAX radio.  And we've identified that when they --

5    we've identified multiple ways in which they've directly

6    infringed our copyright.  And we've also identified inducement

7    and contributory infringement in here.

8           But in terms of the copyright infringement, we've

9    given several examples.  So, they breached by

10   reverse-engineering, by copying, by modifying, by changing or

11   deleting the user interface.  And all of these are laid out.

12   I mean, we've locked into the complaint the provisions of the

13   agreement, license agreement that they're violating.

14          All use of our firmware after that is in violation of

15   our copyright.  They were supposed to destroy it and not use

16   it.  They haven't done that.  In fact, they're using it --

17   they're running around using it all over the place including

18   in demonstrations.  That's unauthorized use of our copyrighted

19   code.

20          So, we've identified multiple sections.  We've

21   identified public display and public performance.  We've

22   identified unauthorized use of our code by using the user

23   interface.  And we've identified how they've induced people to

24   use their code, which copies portions of our code, deletes

25   others, causes them to violate our license agreements, and

1     numerous -- numerous other things.

2          THE COURT:  5.2.1 and 5.3, do each of those encompass

3     just one program, or are there many programs?

4          MR. BERTIN:  There are many programs that are part of

5     it.

6          THE COURT:  Some of which are GPL, and some of which

7     are not?

8          MR. BERTIN:  Yes.

9          THE COURT:  All right.  Any final thoughts as the

10    movant?

11         MR. GUY:  Your Honor, I think he just admitted the

12    major point, which is he now admits his complaint did say

13    information, and I think at -- and the Court is correct, you

14    do not have a copyright protectable interest in information.

15    It has to be an original expression, and they need to proceed

16    on that original expression.

17         What we have is a complaint that does not define or

18    present that original expression, and instead, what we have is

19    some vague reference to information.

20         So, again, I think this could be solved, give them

21    the option, certainly the out, to amend, to narrow it.

22         But our biggest concern -- we are incredibly happy to

23    hear that this is what the case is about, believe me, because

24    it is so much narrower and so much more limited than basically

25    everything that's in the code, and that is currently what the

1   pleadings look like.

2        So, we'd definitely ask the Court that the motion to

3   dismiss should be granted.  We are not opposed to granting

4   leave to amend to these narrower points, but they don't get --

5   they certainly don't get to come in to this court and claim

6   that they're entitled to a copyright protectable interest in

7   calibration or configuration information.  That is just wrong

8   as a basic tenet of copyright law.

9        So, I'll leave it with that.  Thank you, your Honor.

10       THE COURT:  Okay.  Let's say -- I don't know what I'm

11   going to do with this, but let's say that I agree with you and

12   they come in with a much more streamlined -- Ubiquiti comes in

13   with a much more streamlined complaint.  I'm not going to get

14   a 12(b)(6) saying, "There isn't enough here," because then

15   you're just being Lucy to his Charlie Brown.

16       MR. GUY:  I'm sorry.  I thought you said Lucy to his

17   Charlie Brown.

18       THE COURT:  I did.

19       MR. GUY:  Okay.  I got it.

20       THE COURT:  With the football and the kicking.

21       MR. GUY:  Your Honor, if they limit their complaint

22   to what has just been described, that they are going to

23   identify what this protectable configuration code is and

24   identify that and also the specifics of the browser that are

25   being used when we instruct people to delete, if those two

1  were the limits, I think that would be the end of it, and we'd
2  proceed with the case.

3         That leaves open the idea that we can move for
4  summary judgment, and we'll ask the Court that perhaps they
5  entertain an earlier motion, if we can.  I think that's what's
6  happened in a number of these cases.  But from a pleading
7  point of view, I think we've done our job.

8         THE COURT:  Okay.  Any final thoughts?

9         MR. BERTIN:  Yeah.  Yes, your Honor.  In terms of the
10 configuration information which is part of our firmware and
11 the calibration information which is part of our firmware,
12 there's no basis to decide anything about that.  We haven't
13 seen the code.  We haven't talked about the code.  We've
14 alleged that they've infringed it, but we haven't examined the
15 code.

16        And in these cases, for example, the *Computer*
17 *Associates versus Quest* case that we cite and talk about in
18 our brief, I mean, it's after preliminary injunction
19 proceeding where experts have weighed in, and the court at
20 that stage many months in to the case has said notwithstanding
21 the fact that there's open source parts of the code, there's
22 stuff here that is likely to be infringed, and the case
23 proceeds.

24        We are really at the outset of the case.  We've
25 produced a very detailed complaint that looks at -- and

1  provides exactly factually what their device does at each

2  stage, and it's well-supported.  We haven't even looked at the

3  calibration information or configuration information, which is

4  part of our code.  And it looks like code.  In the case of,

5  for example, the configuration information, we have a

6  configuration partition, which is where this stuff resides,

7  and they copied that. And so this is not a wide open exercise

8  with respect to those two things.

9  And then more broadly, with respect to our copyright

10  allegations, they're copying Version 5.2.1 and 5.3 every time

11  they hold over on a breach.  So, it's our code that is the

12  basis for the comparison, for example, of copyright

13  infringement there because they're continuing to use our code.

14  And I've identified several proprietary parts of it, but there

15  are others as well.

16  You know, and so I think that the complaint is well

17  pled; and I think that while they're painting this out to be

18  something much broader than it is, I think I've laid out three

19  or four things, user interface and these two other pieces of

20  code, and a radio.  And this is not a wide-open thing.  There

21  could be others, but I haven't laid out something that -- we

22  haven't laid out something that is this wide open thing.

23  And it's not just the user interface that infringes.

24  As we've said, it's holdover, you know, infringement by them

25  and, you know, contributory inducement.  There's copying of

1  these parts that we identify, calibration and configuration

2  and so forth.  And that's just the copyright piece of it.

3        So, anyway, I think that -- you know, that we've

4  provided more information here, and not less, and I just don't

5  see any benefit to -- you know, to having to make it more

6  specific.  We're happy to do it if that's what your Honor

7  wants, but we think that it's all here.

8        THE COURT:  All right.  Okay.  Well, thanks for your

9  briefs, and thanks for your arguments here this morning in

10 responding to my questions.  I'm going to --

11       MR. GUY:  Your Honor, there are other claims.  I'm

12 not sure if you want us to address them, other than just the

13 copyright and the contract claim.  I believe that the Illinois

14 count also fails, as well as Count 7, which is tortious

15 interference.  We can -- on the other counts --

16       THE COURT:  I was able to grasp those other counts.

17       MR. GUY:  What was that?

18       THE COURT:  I was able to understand --

19       MR. GUY:  Thank you.

20       THE COURT:  -- the parties' positions on those other

21 counts.

22       MR. GUY:  I mean, we're here.  We're happy to talk,

23 your Honor, if you have any questions; but we think those are

24 fairly clear.

25       THE COURT:  Okay.

1    MR. BERTIN:  And I think our brief is fairly clear on
2    the points we talked about, and those other points as well.
3            THE COURT:  Yes.
4            MR. BERTIN:  Thank you, your Honor.
5            THE COURT:  Jackie, let's set this for the week of
6    January 21st.
7            THE CLERK:  Sure.  How about January 23rd, 9:15 a.m.
8            THE COURT:  It's my hope to issue a ruling before
9    then.  If I can't, then I'm just going to push back the status
10   hearing.  And again, if anybody wants to come in on a motion
11   with respect to the MIDPs or discovery generally, you can do
12   so.
13           MR. BERTIN:  What is the status, your Honor, of
14   the -- of discovery in the case?  Should we --
15           THE COURT:  Well, right now, we're under the MIDP,
16   and that's just how it goes.  And then you do the MIDPs and
17   then go forward with discovery afterwards.  So, unless it's
18   changed, that's what they're doing.
19           MR. GUY:  I have a conflict on the 23rd.  I could
20   do -- I'm not sure whether the 25th is open.
21           THE CLERK:  How about the 24th?
22           MR. GUY:  24th, I have another hearing.
23           THE CLERK:  28th?
24           MR. GUY:  One second.  28th?  28th is fine.
25           THE CLERK:  January 28th?

1      MS. HERRINGTON:  January 28th.

2      THE CLERK:  9:15 a.m.

3      MR. BERTIN:  That works for me.

4      MS. HERRINGTON:  That's a Monday, is that correct?

5      THE CLERK:  Yes.

6      MS. HERRINGTON:  Thank you.

7      MR. GUY:  Thank you, your Honor.

8      MR. BERTIN:  Thank you, your Honor.

9      MS. HERRINGTON:  Thank you, your Honor.

10     THE COURT:  Thanks.

11   (Which were all the proceedings heard.)

12                        CERTIFICATE

13   I certify that the foregoing is a correct transcript from

14   the record of proceedings in the above-entitled matter.

15

16   */s/Charles R. Zandi*              *December 12, 2018*

17   Charles R. Zandi              Date
     Official Court Reporter

18

19

20

21

22

23

24

25