# EXHIBIT 1

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
   UBIQUITI NETWORKS, INC.,        )
 4                                 )
                  Plaintiff,       )
 5                                 )
   -vs-                            )  Case No. 18 C 5369
 6                                 )
   CAMBIUM NETWORKS, INC.,         )
 7   CAMBIUM NETWORKS, LTD.,        )
   BLIP NETWORKS, LLC, WINNCOM     )
 8   TECHNOLOGIES, INC., SAKID      )
   AHMED, and DMITRY MOISEEV,      )  Chicago, Illinois
 9                                 )  December 11, 2018
                  Defendants.      )  9:10 a.m.
10

11               TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE GARY FEINERMAN
12
   APPEARANCES:
13
   For the Plaintiff:       MORGAN LEWIS & BOCKIUS, LLP
14                          BY:  MR. ROBERT C. BERTIN
                            1111 Pennsylvania Avenue, N.W.
15                          Washington, DC  20004-2541
                            (202) 373-6672
16

17                          MORGAN LEWIS & BOCKIUS, LLP
                            BY:  MS. ELIZABETH B. HERRINGTON
18                          77 West Wacker Drive
                            5th Floor
19                          Chicago, Illinois  60601
                            (312) 324-1000
20

21
   Court Reporter:
22
                      CHARLES R. ZANDI, CSR, RPR, FCRR
23                        Official Court Reporter
                       United States District Court
24          219 South Dearborn Street, Room 2128
                       Chicago, Illinois  60604
25               Telephone:  (312) 435-5387
            email:  Charles_zandi@ilnd.uscourts.gov
</pre>

```
 1   APPEARANCES:   (Continued)

 2   For the Defendants:      BAKER BOTTS, LLP
                              BY:   MR. HOPKINS GUY
 3                                  MR. JON V. SWENSON
                              1001 Page Mill Road
 4                            Bldg. 1, Suite 200
                              Palo Alto, Caliifornia  94304
 5                            (650) 739-7510

 6                            MICHAEL BEST & FRIEDRICH, LLP
                              BY:   MR. JAMES P. FIEWEGER
 7                            444 West Lake Street
                              Suite 3200
 8                            Chicago, Illinois  60606
                              (312) 222-0800
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (Proceedings heard in open court:)

2         THE CLERK:  18 C 5369, Ubiquiti Networks, Inc., v.

3    Cambium Networks, Inc., et al.

4         MS. HERRINGTON:  Good morning, your Honor.  Beth

5    Herrington on behalf of plaintiff Ubiquiti.

6         MR. BERTIN:  Rob Bertin on behalf of Ubiquiti.

7         MR. FIEWEGER:  Good morning, your Honor.  Jim

8    Fieweger on behalf of Cambium.

9         MR. GUY:  Hopkins Guy, Baker Botts, for Cambium.

10         MR. SWENSON:  Jon Swenson from Baker Botts also for

11    Cambium.

12         THE COURT:  Good morning.  So, we're here for a

13    status hearing, and there's also a fully briefed motion to

14    dismiss.  Were the parties able to serve their mandatory

15    initial disclosures last week?

16         MR. GUY:  Yes, your Honor.

17         MS. HERRINGTON:  Yes, your Honor.

18         MR. BERTIN:  Yes.

19         THE COURT:  Any issues that you need to raise with

20    me?

21         MR. GUY:  Yes, your Honor.

22         THE COURT:  Okay.

23         MR. GUY:  They listed only one witness, your Honor.

24    Despite a -- some 69-page claim with 398 paragraphs in it,

25    they only listed one migrating employ.  They did not list the

1   author of any copyright, nor did they list any witness who had
2   any knowledge of any of the contracts in the case.

3         So, they've listed one witness, your Honor, and
4   they've indicated that there is -- that they will indicate
5   on -- designate an expert in the future.

6         We think this is rather unusual because I think that
7   the entire motion to dismiss is -- the last question the Court
8   had, "Can't this be done with discovery," I think the point is
9   we don't even have a named witness who has knowledge or
10  discoverable information regarding their copyrights, their
11  contracts, or any of these things, other than this one
12  employee.

13        THE COURT:  Okay.  Have you had a chance to talk with
14  the plaintiff about this issue?

15        MR. GUY:  It's been raised, your Honor, but it was
16  filed about a week ago, I believe -- actually, six days ago.

17        THE COURT:  Okay.  So, are you -- have you reached
18  out to the plaintiff?

19        MR. GUY:  Yes, we have.  We've objected, and it is in
20  process; but that is the current status of it, your Honor.

21        MR. BERTIN:  This is the first we've heard of that.
22  We're happy to supplement and provide additional people, but I
23  had no idea that -- that they had this objection.

24        MR. GUY:  Well, we do have this objection, your
25  Honor.  I thought my office had communicated that objection.

1   THE COURT:  All right.

2   MR. GUY:  I have the disclosure with me.  It's clear

3   that they only listed one -- they listed basically our

4   defendants, individuals, and they listed this one witness; and

5   they did not list -- I don't think that's in dispute.  They

6   did not list the author of any copyright, any source code, nor

7   did they list anybody who has knowledge, firsthand knowledge

8   of negotiating the GNU license or negotiating any of their

9   licenses.

10   THE COURT:  Okay.

11   MR. BERTIN:  We can certainly identify developers in

12   a supplemental disclosure that we send to the other side.

13   THE COURT:  And so under the -- you may be operating

14   under a Rule 26(a)(1) frame.  Yeah, 26(a)(1) requires the

15   parties to disclose anybody that they intend to use, any

16   witness that they intend to use to support their claims or

17   defenses.  And maybe you just want to use one person, and

18   that's fine.

19   But the MIDP disclosures are broader than that, and

20   they require not just the people that you want to use, but

21   also anybody with knowledge of -- you know, material knowledge

22   of the material underlying facts.

23   So, I don't know.  Maybe Ubiquiti's a one-person shop

24   and there's just one person; but if not, you'll probably want

25   to supplement.  It's premature at this point for me to give a

1    ruling, and I haven't been asked for a ruling; but I imagine
2    you'll be having discussions in the near term about that.
3             MS. HERRINGTON:  Certainly.
4             MR. GUY:  Yes.
5             THE COURT:  Anything else about the MIDPs that we
6    need to discuss?
7             MR. GUY:  Your Honor, I do want to make sure that
8    we're clear.  We have an amendment to the MIDP rules.  We
9    would prefer that our -- that any disclosure, further
10   disclosure be done, I think it's 40 days after the ruling on
11   this motion.  I think we would ask that we be underneath the
12   recent amended rule change.
13            MR. BERTIN:  Sorry.
14            THE COURT:  Yes, go ahead.
15            MR. BERTIN:  Okay.  The only thing I would say is
16   that, you know, similarly, under their disclosures, they
17   haven't identified anybody that works at the company that has
18   written any source code for the company.  So, the same thing
19   is present in their disclosures.
20            They have identified three people at an Eastern
21   European software shop; and just in terms of the status
22   conference, if they're the only people that worked on the
23   code, I just want to be mindful of that from a scheduling
24   standpoint because we may be doing Hague -- Hague discovery
25   and things like that.

1          But I thought that they might have had the director

2    of engineering or, really, anybody else at Cambium as part of

3    the disclosures, and they weren't there.  So, I don't know how

4    much discovery we're going to be doing in Eastern Europe.

5          THE COURT:  All right.

6          MR. BERTIN:  And I assume that there's somebody at

7    the company that has been involved in software development.

8    We'll be talking about that as well.

9          MR. GUY:  Your Honor -- I'm reading from our

10   disclosures here.  One of the named defendants, Sakid Ahmed,

11   and Dmitry Moiseev were both indicated as they have

12   information relevant to the high-level development of the

13   Elevate firmware and related installation process.  And same

14   with respect to Moiseev likely has information relevant to the

15   engineering design and operation --

16         THE COURT:  If you can slow down just a little bit

17   for our court reporter.

18         MR. GUY:  Okay.  So, the operation of Elevate

19   firmware and related installation process.

20         So, the design was done.  It did go out to the

21   Ukraine for implementation, and I would agree with counsel

22   that we are going to have some issues with discovery in the

23   Ukraine.  I mean, they are not -- we do not have control over

24   them.

25         THE COURT:  Are they employees of Cambium?

1          MR. GUY:  No.

2          THE COURT:  But they're vendors of Cambium?

3          MR. GUY:  They did -- we did pay them in order to do

4   the code, yes.  They were outsourced.

5          THE COURT:  Is there an ongoing relationship?

6          MR. GUY:  There is something of a relationship, and

7   we are attempting to reach out to them at this point; but we

8   have not gotten confirmation that they will make these

9   witnesses available and provide us the documentation.

10          THE COURT:  Okay.  Well, we'll cross that bridge when

11   we come to it, but if you -- if Cambium has some sort of

12   ongoing relationship with these Ukrainian coders, I have to

13   imagine that the Ukrainian coders would cooperate as a

14   condition of a continuing relationship with Cambium.  And that

15   may be how we do it.  In other words, ultimately, it may be on

16   Cambium to grease the wheels as to the non-parties with whom

17   it continues to have a business relationship; but again, we're

18   not quite there yet.

19          So, anything else about -- so, we had the request for

20   putting off the MIDP disclosures -- or at least the production

21   of documents until 40 days or 30 days after the resolution of

22   the motion to dismiss.  It raises -- it sounds like a simple

23   request, and it is, viewed through a certain lens.  At the

24   same time, the purpose of the MIDP is not to create a

25   PSLRA-type regime for discovery, where there's an effective

1  discovery stay pending resolution of a motion to dismiss.

2  So, I don't want -- what I don't want to happen is

3  that there's no discovery or no document discovery pending

4  resolution of the motion to dismiss because that would mean

5  that under the MIDP, there's less discovery rather than more

6  discovery, and that's just -- was not the purpose of the MIDP

7  or the amendment to the MIDP.

8  So, maybe the solution is that formal MIDP document

9  production doesn't take place, but everything else is fair

10  game, absent a further order of the Court.

11  And there are some circumstances pre-MIDP in

12  non-PSLRA cases where there was a motion to dismiss and a

13  request to stay discovery pending resolution of the motion to

14  dismiss where it made sense to do that, so I'm not saying it's

15  impossible or out of the question.  But it would require -- it

16  would require a motion and a showing why this case is

17  different, is not -- is different from most other cases in

18  terms of having a motion to dismiss proceed simultaneously

19  with ordinary discovery on the assumption that the MIDP

20  disclosures will be put off.

21  So -- and the amendment is new, so all of this hasn't

22  really been worked out yet.  So, I guess the bottom line is

23  figure out what you'd like and -- in terms of not just MIDP,

24  but also ordinary discovery; and file a motion requesting the

25  relief that you want, although not until you talk with the

1   plaintiff and get the plaintiff's view.  And maybe it's an
2   agreed motion.  Maybe it's not.  But I would do the Local
3   Rule 37.2 consultation before any -- any such motion is filed.
4           So, anything else about discovery or MIDPs?
5           MR. GUY:  None from the defendants, your Honor.
6           MR. BERTIN:  None from the plaintiffs, your Honor.
7           THE COURT:  So, let's go to the motions to dismiss.
8   I'm going to give the plaintiff a chance to have the first
9   word here in court, given that the defendants had the last
10  word in writing during the briefing schedule.  Let me just --
11  for what it's worth, and it may not be worth anything, let me
12  give you my tentative thoughts.  And it's not really a bottom
13  line thought.  It's more of a process thought.
14          What I read as the main thrust of the motion to
15  dismiss, so it was definitely the lead of the motion to
16  dismiss, was the complaint is alleging just deletion of
17  software, not modification or copying.  None of the law --
18  statutes or common law doctrines asserted by the plaintiff
19  prohibits deletion; and, therefore, the complaint doesn't
20  allege a violation of law.
21          That was really the main thrust of -- at least from
22  my view, the main thrust of the motion.  Then in the response
23  brief, the plaintiff said, "What are you talking about?  The
24  complaint doesn't just allege deletion.  It also alleges
25  modification and copying, and here's why modification and

1    copying is covered by the Copyright Act and all of the other

2    doctrines that were -- the legal theories that were set forth

3    in the complaint."

4          And then in the reply brief, the defendant said,

5    "Well, you're forgetting about the GPL, the general public

6    license; and the general public license allows us not just to

7    delete, but also to modify and copy."

8          I think the GPL was discussed in the opening brief;

9    but if it was intended to be the lead, and I think it turned

10   out to be the lead, at least in the reply brief, the lead was

11   a bit buried in the opening brief.

12         But that said, I don't think it was forfeited.

13   I think it was presented in the opening brief.  And I'm

14   wondering if the plaintiff can address the arguments in the

15   reply regarding the GPL, as well as anything else that you'd

16   like to address.

17         MR. BERTIN:  Yes.  Thank you.  Thank you, your Honor.

18   We are sort of having a big merits dispute on the complaint at

19   this stage; and, you know, we think for all of the reasons

20   stated in our opposition that there's sufficient factual

21   allegations to establish, notwithstanding the GPL,

22   infringement.

23         On your specific question about GPL, essentially,

24   what they've argued in the reply is that because there's some

25   GPL code on this embedded device's firmware, that that excuses

1    all conduct with respect to the whole of the program.  And

2    they've also alleged that that's the case in part because we

3    haven't allegedly identified anything that's proprietary

4    within the firmware, but that's not the case.

5         So, we've identified a user interface that's

6    proprietary.  And, for example, Exhibit J to the complaint

7    shows our proprietary user interface.  We've talked about the

8    user interface in the complaint and --

9         THE COURT:  Is the user interface separate and apart

10   from the software or from the firmware that Ubiquiti installs

11   on the hardware?

12        MR. BERTIN:  It's part of the installation of the

13   hardware, user interface code, but it's a distinct program

14   from other programs that are part of the firmware, much like

15   Microsoft Office has Microsoft Word and Power Point and other

16   things, and even Microsoft Windows has multiple programs like

17   printer drivers and display drivers and other things that are

18   distinct.

19        And, for example, with respect to copyright

20   infringement, they point only to their use of Elevate and its

21   copying and modifying of certain things as being excused by

22   the GPL; but the complaint also alleges copyright infringement

23   by their violating the license agreement and then continuing

24   to use and demonstrate the Ubiquiti program itself in live

25   hacking demonstrations showing how to install Elevate.  And

1   during those demonstrations, for example, in the webinar,

2   they're publicly displaying and publicly performing the user

3   interface software, our user interface software, and showing

4   people how to bring it up and then download the Elevate

5   software and then type that in to our user interface.

6          So, that's just one example of the part of the code

7   that is infringed, and it's something that we keep kind of

8   harping on; but they try to indicate narrowly what the

9   copyright infringement is.

10          THE COURT:  Does the user interface code incorporate

11  at all the public use code?

12          MR. BERTIN:  No.

13          THE COURT:  But there are parts of the Ubiquiti

14  firmware that does incorporate the public use code?

15          MR. BERTIN:  Parts of the firmware on the device,

16  yes.  For example, there's a Linux-type kernel on the device.

17  Many companies make proprietary software for embedded devices

18  that run on Linux, and Ubiquiti is no different.  They make --

19  they use leveraged Linux, and they also have programs that run

20  on Linux that are distinct.

21          THE COURT:  So, is Cambium right that if you take

22  public source software and create something with it, whatever

23  it is you create also has to be public source, and there's --

24  you basically grant the license to everybody to use it?  Isn't

25  that kind of the whole point of open source software?

1        MR. BERTIN:  That's not the whole point of open

2   source software *per se*.  It is in part.  Like, for example, if

3   you make an open source program and then I want to make an

4   improved program, anything I do to that program that you've

5   put out there in open source, anything I do to modify that

6   program is going to be open source, and I'll have no claim

7   to it.

8        But this is a multi-billion-dollar industry now, with

9   people introducing, you know, proprietary, you know, code that

10  works with open source code and so forth.

11       And what it comes down to -- and their brief kind of

12  conflates some of these issues, but for example, Ubiquiti can

13  add to the open source code by creating an entirely new

14  program and then release it to be part of the open source

15  program so that it works together with the program.  So,

16  they'll own the copyright in that, but then they've licensed

17  it to the world by combining it with these other programs.

18  Okay?

19       But they can also modify somebody else's program

20  that's included in open source work, and then Ubiquiti would

21  actually own those modifications; but nevertheless, they'd be

22  subject to open source licensing.

23       And then Ubiquiti and others can create new

24  proprietary programs that are distinct from open source that

25  maybe run on top of Linux that they'll own because they're

1  distinct programs.

2  And if you look at the -- we have this in a couple of

3  footnotes in our opposition brief, but if you look at the --

4  each of the open source licenses that defendants attach to

5  their motion, each of them addresses this -- this issue.  And

6  what they basically say is that mere aggregation of a work,

7  of a program with an open source program -- yeah, here it is.

8  So, if you look at Exhibit 5, which is the GPL

9  version, too, at the very bottom of page -- at the very bottom

10  of page 2, which is in Section 2 of the license, it says, "In

11  addition, mere aggregation of another work not based on the

12  program with the program or with a work based on the program

13  on a volume of storage or distribution medium does not bring

14  the other work under the scope of this license."

15  And that's powerful because it allows people to --

16  to leverage open source, make contributions to open source,

17  but also keep some programs separate that also leverage that

18  open source, and so --

19  THE COURT:  So, let's just get down to brass tacks.

20  So, what you're saying is that -- what I think you're saying

21  is that -- and please tell me if I'm wrong -- that the Cambium

22  software at issue in this case, some of it is derivative of

23  the public source software, and that stuff is not protected

24  because of the GPL; but there are other programs as part of

25  the suite of software programs that are not derivative of the

1   GPL and simply because those non-GPL-derivative programs --
2   I'm sorry, yeah, non-public-source-derivative programs are
3   presented together with public-source-derivative programs
4   doesn't mean that the GPL creates a license to use the
5   non-public-source-derivative programs?
6            MR. BERTIN:  Yes.
7            THE COURT:  Okay.  So, what are the
8   non-public-source-derivative programs in Cambium's suite of
9   software that's at issue in this case?  You've told me one,
10  which is the proprietary user interface.  What's another one?
11           MR. BERTIN:  Well, so, there's two -- there's two
12  separate factual scenarios, if I can -- one is what their code
13  includes from our code, let's say, or that's not part of GPL.
14  And the other is what our code includes that's not part of the
15  GPL.
16           So, the user interface is one.  There's two things
17  that are specifically pled in our complaint, the configuration
18  code and the calibration code.  Those are two things that we
19  allege are not part of the -- are not part of the GPL, and
20  we've alleged that Cambium has copied those and made
21  unauthorized use and access to those things.
22           Cambium has not disputed that those are not part of
23  the GPL.
24           THE COURT:  Then where does the proprietary user
25  interface code fit in?

1           MR. BERTIN:  That's something in our code, but it's

2  not in their code; but they commit copyright infringement

3  every time they publicly perform or publicly display our user

4  interface after breaching --

5           THE COURT:  And that's alleged in the complaint?

6           MR. BERTIN:  That's alleged in the complaint.

7           THE COURT:  And then in terms of the configuration

8  code and the calibration code, this is something that you're

9  saying that Cambium incorporated into its own code?

10          MR. BERTIN:  Yes.  Yeah, they directly copied the

11  configuration --

12          THE COURT:  So, we have the public performance of the

13  proprietary user interface during the webinars or the

14  seminars?

15          MR. BERTIN:  Right, right.

16          THE COURT:  And is there anything else that your

17  complaint alleges that is publicly performed but not

18  incorporated in the Cambium software?

19          MR. BERTIN:  In terms of the public performance

20  rights, that's the main thing.

21          THE COURT:  Okay.  So, that's one bucket, and there's

22  one item in that bucket, which is proprietary user interface.

23  The second bucket is your code that you say Cambium

24  incorporates into its own code, but your code is not covered

25  by the GPL.  And you've given me two examples, the

1    configuration code and the calibration code.  Yes?

2             MR. BERTIN:  Yes.

3             THE COURT:  Are there any other examples?

4             MR. BERTIN:  Yeah.  Another example is the

5    proprietary AirMAX protocol that's mentioned in the complaint,

6    and then there's everything else.  But those are specifically

7    called out as proprietary portions.

8             And again, every time that they, for example, use

9    our code, our whole firmware after breaching the license

10   agreement, they're -- they're making unauthorized use of our

11   copyrighted code; and that's an act of copyright infringement.

12            THE COURT:  Okay.

13            MR. BERTIN:  But those are the four matters.

14            THE COURT:  If -- what is the proprietary user

15   interface software?  Could you go to the code and say, "Okay.

16   These 1s and 0s are proprietary user interface"?

17            MR. BERTIN:  Yes.

18            THE COURT:  And can you go to your code and say,

19   "Here are the 1s and 0s that's configuration code, and here's

20   the 1s and 0s that are calibration code"?

21            MR. BERTIN:  Yes.  They're the same.

22            THE COURT:  Do any of your claims depend on things

23   that are done to your code that is derivative of the public

24   use code?

25            MR. BERTIN:  None of our claims depend on that.  We

1  haven't asserted any GPL code, and we're not interested in
2  asserting any GPL code.  There's plenty of proprietary --
3          THE COURT:  I'm not talking about GPL code.  You're
4  changing my question.
5          MR. BERTIN:  Okay.  I'm sorry.
6          THE COURT:  I'm talking about stuff that you did that
7  is derivative of GPL code.
8          MR. BERTIN:  Yeah, we're not asserting it.
9          THE COURT:  You made it better --
10          THE COURT:  Right.
11          MR. BERTIN:  So you created a new thing.
12          MR. BERTIN:  Right.
13          THE COURT:  But you're not saying this new thing has
14  been infringed in any way?
15          MR. BERTIN:  Yes, I agree with that characterization
16  as to that category.
17          THE COURT:  Okay.  I think now I understand what the
18  nature of your claim is and how you believe you defeat both of
19  their principal arguments, which is:  One, all we have is
20  deletion, not modification or copying; and two, even if there
21  is modification and copying, it's covered by the GPL.
22          MR. BERTIN:  Yeah.
23          THE COURT:  And is that basically the gist of your --
24          MR. BERTIN:  That's basically the gist it, your
25  Honor, yeah.  If I could add one more thing.

1      THE COURT:  Sure.

2      MR. BERTIN:  And this just illustrates these issue,

3  but also having play into some other things.  The

4  configuration code and the calibration code, they haven't

5  disputed that those are ours and not infected, let's say, with

6  the GPL.

7      What they've said with respect to those things is

8  that they're essentially primarily functional and, therefore,

9  not subject to copyright.  At the same time, they've argued

10  various preemption claims and things like this.  But if

11  they're asserting that the part of the code that they copied

12  is not subject to copyright protection, then how can they be

13  preempted by the copyright laws?

14      So, generally, preemption is something that's rarely,

15  if ever, considered at this stage of the case, because it's

16  the kind of thing where you need to wait to look at the actual

17  1s and 0s of each program that are alleged to infringe and the

18  extent of copying and this and that, and the extent of

19  arguments that, "Well, this isn't really copyrightable."

20  Well, then other things come into play.

21      We've alleged several reasons why preemption is not

22  applicable, but that's just one example of why at this early

23  stage it would be difficult to show preemption.

24      THE COURT:  Okay.  All right.  Thanks.  Before I turn

25  the microphone over to Cambium, sir, do you have a case that

1    was called -- do you have a case that was supposed to be
2    called at 9:00 o'clock?
3              MR. REDMOND:   Thomas v. Dart.
4              THE COURT:   Okay.  Let's take a very quick break.
5    You can collect your thoughts.
6              So, why don't we call Thomas v. Dart.
7       (Recess had.)
8              MR. GUY:   Re-approach, your Honor?
9              THE COURT:   Yeah.  We'll resume with Ubiquiti versus
10   Cambium.
11             All right.
12             MR. GUY:   Thank you, your Honor.  Let me take those
13   arguments in order, if I may.  First of all, with respect to
14   the interface, if that -- if they are -- if they're saying
15   there are two copyright contract breaches here, and one of
16   them is the interface, then at paragraph 44 of their
17   complaint, they say, "The hacked firmware deletes portions of
18   Ubiquiti firmware and Ubiquiti user interfaces with Ubiquiti
19   M-series devices."  So, in a motion to dismiss, that's taken
20   as true, and we agree that it does delete it.
21             So, if they are saying that they have some right in
22   the interface and it's a demonstration right under the
23   copyright or a performance right that they're saying that we
24   are in violation of that, then we would gladly accept their
25   amendment to that, and that will trigger a very specific

1 attack, again, under Section 109(a) of the Copyright Act, that

2 the Copyright Act cannot first of all give us the broad right

3 to delete, yet if we show people how to delete it, that's

4 somehow in violation of some other right.  They have no right

5 to control that.  And that's exactly where we'd be on that

6 issue.

7         But at a first step, you know, we would love to see

8 the amendment in which they restrict their claim to those two

9 points, one of them being the interface and the deletion

10 issue, and the second being some new code that they have with

11 regard to the configuration and I believe it was the -- they

12 referred to it as the calibration code.

13         So, let me get --

14         THE COURT:  So, let's -- can we just focus on the

15 user interface for a second?

16         MR. GUY:  Sure.

17         THE COURT:  So, defense counsel is saying that

18 the principal allegation regarding the user interface is

19 paragraph 44, and all it alleges is deletion.  Is there

20 something else alleged as to the user interface in the

21 complaint that counsel has not addressed?

22         MR. GUY:  There is.

23         THE COURT:  And if so, where is it?

24         MR. GUY:  There is other mention of the interface,

25 but their admission that it is deleted is full stop under

1    Section 109.  We have the right to delete it.

2            THE COURT:  Well, no.  Just because I say you punched

3    me in the face doesn't mean that you also didn't kick me in

4    the leg.

5            MR. GUY:  But that would be a different right, your

6    Honor.

7            THE COURT:  Paragraph 44 says that there's deletion

8    of a portion of the user interfaces.  Maybe the complaint

9    alleges that other things are done with the user interfaces.

10   So, is there anything else that the complaint alleges that

11   Cambium does with the user interfaces?

12           MR. BERTIN:  There's a lot of stuff that the

13   complaint alleges that Cambium does with the user interfaces,

14   but -- they allege the webinar --

15           THE COURT:  So, paragraph numbers.

16           MR. BERTIN:  Well, let's see.  I want to start with

17   the actual copyright infringement, the fourth claim for relief

18   at page 53 of the complaint at paragraph 284.  And it says,

19   "Cambium has directly infringed and will continue to infringe

20   Ubiquiti copyrights and Ubiquiti firmware by violating

21   Ubiquiti firmware license by making unauthorized copies and

22   use of Ubiquiti firmware."

23           THE COURT:  If that's what you're relying on, it's

24   not going to get you where you need to go because that's just

25   a conclusory allegation -- two problems with it.  One is it

1    doesn't reference the user interface, and second, it just is a

2    conclusory allegation of copyright infringement.

3            MR. GUY:  We agree, your Honor.

4            If you could refer to the paragraph number.

5            MR. BERTIN:  Yeah, thank you for that.

6            So, there's a whole section here, paragraph 62

7    through 71, where we talk about Cambium's unlawful promotion

8    and distribution of the hacked firmware.  And, you know, here,

9    we talk about the materials where we induce them to make --

10   you know, to make modifications.  Let's see here.

11           Yeah.  So paragraph 71, "Cambium has continued to

12   heavily promote the hacked firmware in the United States or

13   elsewhere with additional webinars directed at WISPs and

14   marketing and distribution of literature and web pages through

15   third-party distributers, including distributors used by both

16   Ubiquiti and Cambium."

17           THE COURT:  But again, there's nothing here about the

18   interface.

19           MR. BERTIN:  Well, if -- I can continue to go through

20   this for a minute, but there's -- we -- we basically -- the

21   primary allegations in here are that in promotion that they've

22   done live -- live hacking, and --

23           THE COURT:  Of what?  Of the stuff that's covered by

24   the GPL or the other stuff?

25           MR. BERTIN:  No, the user interface.

1          THE COURT:  But you've got to allege that.

2          MR. BERTIN:  It is alleged in here.

3          THE COURT:  Well, show me.  I'm giving you a chance.

4    Show me.

5          MR. BERTIN:  So, paragraph 160 is another example.

6    So -- and there's -- okay.  So, we talk about in this -- the

7    fifth bullet, "Cambium's November 30th webinar designed to

8    target Ubiquiti customers and provide a step-by-step procedure

9    for hacking the Ubiquiti M-Series firmware, which prominently

10   feature these two defendants which contain numerous

11   admissions."  Okay.  And then we also talk about Winncom

12   hosting an ePMP course, October 7th through 9th, at the

13   WISPAPALOOZA 2017 convention.

14         We have also attached a transcript of that webinar to

15   the complaint.  Okay?  And let me try to find the exhibit.

16   This is a partial transcript, Exhibit F to the complaint,

17   where they -- and we've also attached the quick-start guide to

18   the complaint, which is at Exhibit D.  And the webinar refers

19   people to this quick-start guide, and they talk about

20   downloading the firmware, using a web browser to navigate to

21   the -- this is on page -- this is on page one, two -- 3 of

22   Exhibit D to the complaint, the quick-start guide, "Using a

23   web browser, navigate to the access point's default IP

24   address, 192.168.0.1.  Log in to the access point web

25   management interface with username admin and password admin.

1   Navigate to Tools, Software, Upgrade, and click the Browse
2   button."

3          So, this is an example of the webinar going into our
4   device's user interface and instructing people how to apply
5   Elevate to it.  And all of that is instructing people to use
6   our user interface, and they're using our user interface at
7   the time.

8          MR. GUY:  If I may comment, your Honor.

9          THE COURT:  Sure.

10         MR. GUY:  So, your Honor, the massive problem that we
11  have, as this demonstrates, is you're picking paragraph 71 and
12  matching it with paragraph 160 and going back to Exhibit D.
13  And in between all of that is a much, much, much broader
14  claim.  If they amend to this idea of a performance -- and
15  what I'm hearing is that they're objecting to the fact that we
16  show their user interface on page 3 and I guess page 4.  If
17  that's the nature of their copyright claim, then all of a
18  sudden, we have a very narrow and very specific claim.  And we
19  would invite that.  We would appreciate the amendment and to
20  focus it on that.  But that's not what we have in this
21  complaint.

22         Let me give you an example how this affects discovery
23  since the pleading will frame discovery.  If the issue is
24  Exhibit D and this interface and not the code behind it, we
25  can say very easily that instructing someone how to delete

1     something is perfectly permissible.  If showing them a picture

2     of their interface is the violation, then we delete the

3     violation.  Damages are limited to that -- that picture, and

4     that's it.  But the way they have it right now is it's

5     everything.  It's all of their code.  And I can demonstrate

6     that to you.

7         So, the question is:  Do I have to produce millions

8     and millions of lines of code, or do I need to simply produce

9     Exhibit D?

10         THE COURT:  Well, the millions and millions of lines

11     of code will come in the second bucket, which is the

12     configuration code and the calibration code.

13         MR. GUY:  I'm chomping at the bit.  Can I go ahead

14     and proceed with that?

15         THE COURT:  Let me ask, is there anything else in the

16     complaint that you believe alleges public performance of the

17     user interface?

18         MR. BERTIN:  Well, paragraph 24 talks about the user

19     interface, which provides an upgrade path for the firmware.

20         MR. GUY:  Paragraph 24?

21         MR. BERTIN:  Paragraph 24.

22         THE COURT:  That doesn't allege public performance.

23         MR. BERTIN:  Paragraph 37 -- well, we've alleged

24     unauthorized use of the code and the copyrights.

25         Paragraph 37 gets into devices, including user

1  interface, for Ubiquiti customers to configure.  User
2  interface is accessed at the designated IP address.  On the
3  first access, they're presented with a license agreement.
4        THE COURT:  And the thing is -- I understand that
5  you're -- as a plaintiff, you're in a tough position, because
6  if you give too little, then you have a *Twombly*/*Iqbal* problem;
7  if you give too much, it's confusing.  And you've got to --
8  it's hard to deal with those competing imperatives.
9        But at the same time, it can't be a scavenger hunt to
10 kind of figure out what your claim is.  That causes a Rule 10
11 problem.
12       MR. BERTIN:  I understand what you're saying.  At the
13 same time, I feel like we provided more information, not less.
14 And we establish in our copyright count section, we're
15 alleging direct infringement for unauthorized use of our --
16 you know, of our copyrighted firmware, in addition to
17 indirect, contributory inducement.  And it's all laid out.
18       And with respect to everything in here, you know, you
19 can't -- deleting the user interface is a -- is a breach of
20 our license agreement, and it says that in here on multiple
21 cases.  We've quoted the language that says that.  So,
22 deleting it is a breach of the agreement.  That creates
23 copyright infringement just by their continuing to have the
24 code.
25       The next section that we cited of the license

1    agreement says once you breach the agreement, you have to
2    destroy all copies of our code.  You can't keep it around.
3    So, anything that they're still keeping is copyright
4    infringement.

5              And it's not their code that they have to go fumbling
6    around trying to find.  It's our code.  They're keeping our
7    code.  So, the copyright comparison is our copyright against
8    our own code that they're keeping and using and our user
9    interface and are they using it.  And that's what's in here.
10   We're alleging direct, that they're infringing our code and
11   that they're breaching and that they're still using it.  So,
12   it's not -- we were not playing hide the ball, and I think
13   that's very clear from here.

14             Now, do you have a requirement under the copyright
15   pleading rules to specifically mention public performance and
16   public display as one of the nine or so bundle of enumerated
17   copyrights?  I'm not familiar with any case that says that.

18             What you do is you allege facts, and you allege
19   direct copyright, inducement, or contributory.  And we've done
20   that, and we've done that in spades; and I've given you
21   multiple examples.  And I don't think that not saying "public
22   performance" or "public display" is a deficiency, and I'm not
23   aware of any case that says that it is.

24             THE COURT:  Well, you don't have to utter -- a
25   complaint doesn't have to set forth legal theories.  That's

1  right.  But you do have to explain factually what it is that

2  the defendants did to violate the copyright or the DMCA or

3  whatever it is that you're alleging.

4     (Bench conference, not reported.)

5        THE COURT:  Okay.  We're going to take one more

6  break, and then I'm going to turn the microphone back over to

7  the defendant.

8     (Recess had.)

9        THE CLERK:  18 C 5369, Ubiquiti Networks, Inc., v.

10  Cambium Networks, Inc., et al.

11       THE COURT:  All right.  So, if there's anything else

12  you want to say about the user interface, I want to give you

13  that chance; and then I know you want to address the second

14  group of items, which is the use of the configuration code and

15  the calibration code.

16       MR. BERTIN:  Your Honor, can I just give you a couple

17  of additional paragraphs, if you don't mind.

18       THE COURT:  Sure.  Yeah, let's just get everything on

19  the table so defendants know what you're alleging.

20       MR. BERTIN:  Okay.  So, paragraph 93, this whole

21  section is right on point because it's talking about the

22  promotion of the hacked firmware.  But 93 talks about the

23  webinar, the November 30th, 2016, webinar.

24       "The webinar directs viewers of the Cambium website

25  to download the hacked firmware and provides instructions on

1  how to navigate the Ubiquiti web user interface driven by
2  Ubiquiti firmware on Ubiquiti M-Series devices in order to
3  replace the Ubiquiti firmware with Cambium hacked firmware."
4      The next paragraph talks about how in the webinar,
5  they talk about supporting XW-based Ubiquiti hardware.
6      And then paragraphs 108, they talk about Cambium
7  promoting its quick-start guide during its November 30th,
8  2016, webinar targeting Ubiquiti customers, stating that
9  Cambium strongly recommends viewers read their quick-start
10  guide.
11      And then paragraph 110 talks about Cambium releasing
12  the quick-start guide instructing Ubiquiti customers on steps
13  to download the hacked firmware from the Cambium website and
14  install it through the web user interfaces driven by Ubiquiti
15  firmware on M-Series devices.
16      THE COURT:  Okay.  All right.  The floor is yours.
17      MR. GUY:  Thank you, your Honor.  I would completely
18  agree with the Court that that is a scavenger hunt, and I want
19  you to know that I did not understand that to be the nature of
20  their copyright claim, that the idea that they are pointing to
21  a browser image as part of a copyright claim which is a
22  performance right and that that is one of their claims, that
23  is not in their complaint.  And our main focus here is the
24  overbreadth of this complaint.  And we would gladly accept an
25  amendment that goes directly to that.  And we believe that we

1  are entitled to that, and we have just demonstrated why that's
2  essential.

3        If I can move to responding to the -- what they refer
4  to as the configuration and calibration code, unless there are
5  any questions by the Court.

6        THE COURT:  No.  Go ahead.

7        MR. GUY:  Okay.  With respect to the configuration
8  and calibration code, I believe he said that three times, the
9  complaint does not refer to it as that.  It doesn't use the
10 word "code."  We just searched it.  The word "calibration
11 code," we couldn't find, nor could we find "configuration
12 code."

13       What they do call out is something called
14 configuration or calibration information.  And the point is
15 that this is something that we believe that if they were
16 required to define what that is, then they have no right
17 to it.

18       And again, we have the same problem as before, that
19 it's super broad, and we don't really -- you know, this is a
20 needle in a haystack; and we've just found perhaps what
21 they're now calling one of their needles, which is this idea
22 of configuration/calibration code.  That's different than
23 what's in their complaint.  They talk about information.  They
24 don't have a right to claim a copyright in information.

25       Now, if I can, your Honor, just so you understand

1  this overbreadth issue, we've got -- I just want to show you
2  one graphic.  It's stapled together.  If I can hand this up.
3          THE COURT:  Of course.
4      (Tendered.)
5          MR. GUY:  And so the overbreadth is that they
6  constantly refer -- if you can just refer to page 4 -- I'm
7  sorry, page 3.  And I'll be brief.  This isn't a long
8  presentation.
9          This is a quote from Exhibit B to the complaint.
10  This is their firmware license.  And if you go through the
11  complaint, what they do is they talk about Ubiquiti firmware
12  or their firmware, and they talk about it with a little "f"
13  firmware.  Then they quote -- about paragraph 37, I believe --
14  38, excuse me, they quote language from this agreement.
15          And then after that, they never define the term
16  Ubiquiti capital F Firmware in the complaint, but they start
17  using Ubiquiti capital F Firmware about 100 times after
18  paragraph 38.  And if you go to the contract they were
19  quoting, you see how broad Ubiquiti firmware is.  It means the
20  firmware in object code form made available on Ubiquiti on --
21  or Ubiquiti devices.  It's everything.
22          But in that same agreement, your Honor, they also
23  define open source software means, "Any software or software
24  component module or package that contains" --
25          THE COURT:  If you can slow down just a bit.

1    MR. GUY:  I'm sorry.  That was a perfect place to
2  slow me down.  Thank you.

3    (Continuing) -- "or is derived in any manner (in
4  whole or in part) from, any software that's distributed as
5  free software, open source software, or similar licensing,"
6  and so forth.

7    So, this is in the agreement that they attach to the
8  complaint.

9    So, at a threshold, they not only cannot claim
10  anything that is subject to a GPL license, but that means not
11  only the code that is -- you know, that they copy and is there
12  verbatim, but anything that is derived in any manner from it.

13    And so that's the overbreadth that the -- in two
14  ways.  What you just heard was a recasting of that a little
15  bit narrower.  They want to suggest that it's not -- well, it
16  could be derived, but it can be new.  Well, if they take
17  something and they derive it and it's new, it's still derived.
18  So, there is a point there.

19    You know, if we -- we would ask that the complaint
20  be limited basically by their own definition of open source
21  that anything in this case cannot include the open source
22  software.  I think you just heard him say that, but that is
23  not what's in the complaint.

24    Now, going on to the -- addressing the
25  configuration/calibration code specifically, I point out that

1    the word "code" is not there.  They talk about it in terms of

2    information.  And, you know, they don't have a copyright on

3    information.  So, if they were required to spell out

4    specifically what that is, is it code, or is it information?

5    We're now in conflict on what that is.

6         Code is not in the complaint.  Information is.  You

7    can't copyright information.  You can't copyright the phone

8    numbers for people in a phone directory.  You may be able to

9    copyright a specific font size and presentation or formatting

10   of a phone book, but you can't copyright the information.

11        So, at a point here, they've already changed, if you

12   will, what their complaint literally says.  They've switched

13   it from information in response to our motion to something

14   called code.  Well, if that's the case, then we would like to

15   see two things:  Identifying what that code is or what those

16   calibration parameters are.

17        What we believe they are is nothing more than the IP

18   address for the device, the name of the device, its power

19   setting, and things like that.  And they have no copyright.

20        So, we'd ask, you know, that they need to be more

21   specific to lay out a claim, because when they put a complaint

22   forward that simply says calibration and configuration

23   information, that is not copyright protectable under the

24   Copyright Act.

25        Your Honor, those are my comments with respect to

1   those two buckets.

2           THE COURT:  Okay.  Very good.  Any final thoughts?

3           MR. BERTIN:  Yeah.  I think it would be news to a lot

4   of people in the world if information is not copyrightable.

5   There are --

6           THE COURT:  Isn't it the expression of information

7   and not the information itself that's copyrightable?

8           MR. BERTIN:  Well, information includes -- includes

9   the expression; but, yes, expressions of information,

10  information is copyrightable.

11          THE COURT:  No.  You just said two completely

12  different things.

13          MR. BERTIN:  Well, I'm agreeing with you that an

14  expression of information is copyrightable.

15          THE COURT:  Okay.

16          MR. BERTIN:  Okay.  But -- okay.  In terms of -- in

17  terms of this being a wide-open exercise, we've asserted --

18  which it's not, we've asserted two very specific versions of

19  Ubiquiti copyrights that are infringed, the registered

20  versions 5.2.1 and 5.3.  We've -- the registrations

21  themselves, which are attached to the complaint, exclude

22  license and materials, previous versions.  And they're

23  directed to new and revised computer code.  It's not an

24  open-ended exercise.

25          And we've identified already several things.  We've

1    identified configuration and calibration information, which is

2    part of the firmware code, in our -- in our complaint.  We've

3    identified user interface in our complaint.  We've identified

4    the AirMAX radio.  And we've identified that when they --

5    we've identified multiple ways in which they've directly

6    infringed our copyright.  And we've also identified inducement

7    and contributory infringement in here.

8          But in terms of the copyright infringement, we've

9    given several examples.  So, they breached by

10   reverse-engineering, by copying, by modifying, by changing or

11   deleting the user interface.  And all of these are laid out.

12   I mean, we've locked into the complaint the provisions of the

13   agreement, license agreement that they're violating.

14         All use of our firmware after that is in violation of

15   our copyright.  They were supposed to destroy it and not use

16   it.  They haven't done that.  In fact, they're using it --

17   they're running around using it all over the place including

18   in demonstrations.  That's unauthorized use of our copyrighted

19   code.

20         So, we've identified multiple sections.  We've

21   identified public display and public performance.  We've

22   identified unauthorized use of our code by using the user

23   interface.  And we've identified how they've induced people to

24   use their code, which copies portions of our code, deletes

25   others, causes them to violate our license agreements, and

1    numerous -- numerous other things.

2        THE COURT:   5.2.1 and 5.3, do each of those encompass

3    just one program, or are there many programs?

4        MR. BERTIN:   There are many programs that are part of

5    it.

6        THE COURT:   Some of which are GPL, and some of which

7    are not?

8        MR. BERTIN:   Yes.

9        THE COURT:   All right.   Any final thoughts as the

10   movant?

11       MR. GUY:   Your Honor, I think he just admitted the

12   major point, which is he now admits his complaint did say

13   information, and I think at -- and the Court is correct, you

14   do not have a copyright protectable interest in information.

15   It has to be an original expression, and they need to proceed

16   on that original expression.

17       What we have is a complaint that does not define or

18   present that original expression, and instead, what we have is

19   some vague reference to information.

20       So, again, I think this could be solved, give them

21   the option, certainly the out, to amend, to narrow it.

22       But our biggest concern -- we are incredibly happy to

23   hear that this is what the case is about, believe me, because

24   it is so much narrower and so much more limited than basically

25   everything that's in the code, and that is currently what the

1  pleadings look like.

2  So, we'd definitely ask the Court that the motion to

3  dismiss should be granted.  We are not opposed to granting

4  leave to amend to these narrower points, but they don't get --

5  they certainly don't get to come in to this court and claim

6  that they're entitled to a copyright protectable interest in

7  calibration or configuration information.  That is just wrong

8  as a basic tenet of copyright law.

9  So, I'll leave it with that.  Thank you, your Honor.

10  THE COURT:  Okay.  Let's say -- I don't know what I'm

11  going to do with this, but let's say that I agree with you and

12  they come in with a much more streamlined -- Ubiquiti comes in

13  with a much more streamlined complaint.  I'm not going to get

14  a 12(b)(6) saying, "There isn't enough here," because then

15  you're just being Lucy to his Charlie Brown.

16  MR. GUY:  I'm sorry.  I thought you said Lucy to his

17  Charlie Brown.

18  THE COURT:  I did.

19  MR. GUY:  Okay.  I got it.

20  THE COURT:  With the football and the kicking.

21  MR. GUY:  Your Honor, if they limit their complaint

22  to what has just been described, that they are going to

23  identify what this protectable configuration code is and

24  identify that and also the specifics of the browser that are

25  being used when we instruct people to delete, if those two

1  were the limits, I think that would be the end of it, and we'd
2  proceed with the case.

3      That leaves open the idea that we can move for
4  summary judgment, and we'll ask the Court that perhaps they
5  entertain an earlier motion, if we can.  I think that's what's
6  happened in a number of these cases.  But from a pleading
7  point of view, I think we've done our job.

8      THE COURT:  Okay.  Any final thoughts?

9      MR. BERTIN:  Yeah.  Yes, your Honor.  In terms of the
10 configuration information which is part of our firmware and
11 the calibration information which is part of our firmware,
12 there's no basis to decide anything about that.  We haven't
13 seen the code.  We haven't talked about the code.  We've
14 alleged that they've infringed it, but we haven't examined the
15 code.

16     And in these cases, for example, the *Computer*
17 *Associates versus Quest* case that we cite and talk about in
18 our brief, I mean, it's after preliminary injunction
19 proceeding where experts have weighed in, and the court at
20 that stage many months in to the case has said notwithstanding
21 the fact that there's open source parts of the code, there's
22 stuff here that is likely to be infringed, and the case
23 proceeds.

24     We are really at the outset of the case.  We've
25 produced a very detailed complaint that looks at -- and

1   provides exactly factually what their device does at each

2   stage, and it's well-supported.  We haven't even looked at the

3   calibration information or configuration information, which is

4   part of our code.  And it looks like code.  In the case of,

5   for example, the configuration information, we have a

6   configuration partition, which is where this stuff resides,

7   and they copied that. And so this is not a wide open exercise

8   with respect to those two things.

9         And then more broadly, with respect to our copyright

10  allegations, they're copying Version 5.2.1 and 5.3 every time

11  they hold over on a breach.  So, it's our code that is the

12  basis for the comparison, for example, of copyright

13  infringement there because they're continuing to use our code.

14  And I've identified several proprietary parts of it, but there

15  are others as well.

16        You know, and so I think that the complaint is well

17  pled; and I think that while they're painting this out to be

18  something much broader than it is, I think I've laid out three

19  or four things, user interface and these two other pieces of

20  code, and a radio.  And this is not a wide-open thing.  There

21  could be others, but I haven't laid out something that -- we

22  haven't laid out something that is this wide open thing.

23        And it's not just the user interface that infringes.

24  As we've said, it's holdover, you know, infringement by them

25  and, you know, contributory inducement.  There's copying of

1    these parts that we identify, calibration and configuration
2    and so forth.  And that's just the copyright piece of it.
3         So, anyway, I think that -- you know, that we've
4    provided more information here, and not less, and I just don't
5    see any benefit to -- you know, to having to make it more
6    specific.  We're happy to do it if that's what your Honor
7    wants, but we think that it's all here.
8         THE COURT:  All right.  Okay.  Well, thanks for your
9    briefs, and thanks for your arguments here this morning in
10   responding to my questions.  I'm going to --
11        MR. GUY:  Your Honor, there are other claims.  I'm
12   not sure if you want us to address them, other than just the
13   copyright and the contract claim.  I believe that the Illinois
14   count also fails, as well as Count 7, which is tortious
15   interference.  We can -- on the other counts --
16        THE COURT:  I was able to grasp those other counts.
17        MR. GUY:  What was that?
18        THE COURT:  I was able to understand --
19        MR. GUY:  Thank you.
20        THE COURT:  -- the parties' positions on those other
21   counts.
22        MR. GUY:  I mean, we're here.  We're happy to talk,
23   your Honor, if you have any questions; but we think those are
24   fairly clear.
25        THE COURT:  Okay.

1        MR. BERTIN:  And I think our brief is fairly clear on
2   the points we talked about, and those other points as well.
3        THE COURT:  Yes.
4        MR. BERTIN:  Thank you, your Honor.
5        THE COURT:  Jackie, let's set this for the week of
6   January 21st.
7        THE CLERK:  Sure.  How about January 23rd, 9:15 a.m.
8        THE COURT:  It's my hope to issue a ruling before
9   then.  If I can't, then I'm just going to push back the status
10  hearing.  And again, if anybody wants to come in on a motion
11  with respect to the MIDPs or discovery generally, you can do
12  so.
13        MR. BERTIN:  What is the status, your Honor, of
14  the -- of discovery in the case?  Should we --
15        THE COURT:  Well, right now, we're under the MIDP,
16  and that's just how it goes.  And then you do the MIDPs and
17  then go forward with discovery afterwards.  So, unless it's
18  changed, that's what they're doing.
19        MR. GUY:  I have a conflict on the 23rd.  I could
20  do -- I'm not sure whether the 25th is open.
21        THE CLERK:  How about the 24th?
22        MR. GUY:  24th, I have another hearing.
23        THE CLERK:  28th?
24        MR. GUY:  One second.  28th?  28th is fine.
25        THE CLERK:  January 28th?

1    MS. HERRINGTON:  January 28th.

2    THE CLERK:  9:15 a.m.

3    MR. BERTIN:  That works for me.

4    MS. HERRINGTON:  That's a Monday, is that correct?

5    THE CLERK:  Yes.

6    MS. HERRINGTON:  Thank you.

7    MR. GUY:  Thank you, your Honor.

8    MR. BERTIN:  Thank you, your Honor.

9    MS. HERRINGTON:  Thank you, your Honor.

10    THE COURT:  Thanks.

11    (Which were all the proceedings heard.)

12                        CERTIFICATE

13    I certify that the foregoing is a correct transcript from

14    the record of proceedings in the above-entitled matter.

15

16    */s/Charles R. Zandi*              *December 12, 2018*

17    _____      _____
      Charles R. Zandi                  Date
      Official Court Reporter

18

19

20

21

22

23

24

25